RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0176P (6th Cir.)
File Name: 03a0176p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

―――――――――――

ELBERT L. HATCHETT and
LAURESTINE HATCHETT,
  *Plaintiffs-Appellees,*

  *v.*

UNITED STATES OF AMERICA,
  *Defendant-Appellant.*

No. 00-1645

―――――――――――

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 94-74708—Denise Page Hood, District Judge.

Argued: February 4, 2003

Decided and Filed: June 4, 2003

Before: SILER, DAUGHTREY, and COLE, Circuit
Judges.

―――――――――――

**COUNSEL**

**ARGUED:** Joan I. Oppenheimer, UNITED STATES
DEPARTMENT OF JUSTICE, APPELLATE SECTION
TAX DIVISION, Washington, D.C., for Appellant. Robert N.
Bassel, KEMP, KLEIN, UMPHREY, ENDELMAN & MAY,
Troy, Michigan, for Appellees. **ON BRIEF:** Joan I.

Oppenheimer, David English Carmack, UNITED STATES
DEPARTMENT OF JUSTICE, APPELLATE SECTION
TAX DIVISION, Washington, D.C., for Appellant. Robert N.
Bassel, KEMP, KLEIN, UMPHREY, ENDELMAN & MAY,
Troy, Michigan, for Appellees.

―――――――――――

**OPINION**

―――――――――――

R. GUY COLE, JR., Circuit Judge. Defendant-Appellant
United States appeals the judgment entered by the United
States District Court for the Eastern District of Michigan in
favor of Plaintiffs-Appellees Elbert L. Hatchett and his wife
Laurestine Hatchett. In an attempt to collect a portion of the
more than $8,000,000 owed by Elbert in unpaid taxes, the
United States commenced administrative levy proceedings by
filing levies and notices of sale for four parcels of real
property, and a levy for the seizure of mortgage payments due
to the Hatchetts on a fifth parcel. In order to stop the
proceedings, the Hatchetts brought a wrongful levy action
against the United States claiming that the levies were
wrongful because they were against properties held by the
Hatchetts as tenants by the entirety. The district court, relying
on a decision of this Court, *Craft v. United States*, 140 F.3d
638 (6th Cir. 1998) agreed with the Hatchetts and found that
the levies were wrongful. The United States primarily argues
that this Court's decision in *Craft* was wrong as matter of law
and that the levies may attach to property held as a tenancy by
the entirety. The United States also argues that the levies
were not wrongful under three other legal theories: (1) a
fraudulent conveyance theory, in which the Government
claims that Elbert used his individual funds to purchase and
enhance property that was titled as a tenancy by the entirety;
(2) a nominee theory, in which the Government claims that
other individuals are holding the entireties properties as
Elbert's nominees; and (3) a lien tracing theory, in which the
Government claims that since it has a lien on Elbert's money,
it is entitled to place a lien on the properties improved or
purchased with that money.

After notice of appeal had been filed and the case had been set for oral argument, the Supreme Court granted certiorari on *Craft* and agreed with the Government's position that federal tax liens may attach to property held by a delinquent taxpayer as a tenancy by the entirety. Because the Supreme Court has answered the question of whether the Government may levy against real property held as a tenancy by the entirety, we **REVERSE** the decision of the district court and **REMAND** for entry of judgment consistent with current Supreme Court precedent. Furthermore, we **REVERSE** and **REMAND** the district court's refusal to allow the Government to amend its complaint and to assert its claim of fraudulent conveyance; we **REVERSE** and **REMAND** the district court's grant of summary judgment for the Hatchetts on the Government's nominee and lien tracing theories.

## I. BACKGROUND

This case began more than twenty-five years ago when Elbert, a prominent Detroit trial attorney, decided to forego payment of federal and state income taxes. In 1989, Elbert was convicted by a jury of four misdemeanor counts of willful failure to pay federal income taxes. *United States v. Hatchett*, 918 F.2d 631, 633 (6th Cir. 1990). He was sentenced to three consecutive one-year sentences, placed on five years' probation, fined $100,000 and ordered to pay "all back taxes" as a condition of probation. *Id.* We affirmed that sentence, and Elbert spent three years in prison. *Id.* at 644.

The Internal Revenue Service ("IRS") made an assessment on October 24, 1994 that Hatchett owed more than $6.6 million in federal income taxes and penalties for the tax years 1975 to 1991. As of March 25, 1998, Elbert's tax liabilities totaled more than $8.6 million.

In an attempt to collect the delinquent taxes, the IRS levied against four parcels of real estate owned by the Hatchetts and one series of mortgage payments owed to the Hatchetts on a fifth parcel pursuant to 26 U.S.C. § 6331 (2002). The Hatchetts received a Tax Levy, dated October 24, 1994, and four Notices of Seizure, dated October 25, 1994. Two of the

properties are owned jointly by the Hatchetts as tenants by the entirety: (1) their primary residence ("West Hickory"); and (2) a property operated as a car wash ("South Saginaw"). Two properties are held individually by Laurestine: (1) a property occupied by Elbert's mother ("Franklin Boulevard"); and (2) a property in Bloomfield Township. The IRS scheduled a public auction to sell the real properties on November 30, 1994.

On January 24, 1995, the IRS levied mortgage payments due to the Hatchetts from a property previously owned by the Hatchetts and used for horsebreeding and entertaining clients ("Cyclone"). The Cyclone property was sold to a husband and wife, Ernest and Hermetha Blythe Ann Jarrett, in 1991. The Hatchetts took back a mortgage of $80,000 on the Cyclone property, to be paid in semiannual installments of $6,000 on interest and principal, beginning February 19, 1992 and continuing until August 19, 2001.

At the time the IRS issued the four levies in 1994, the Hatchetts held title to the West Hickory and South Saginaw properties as tenants by the entirety. Laurestine has held individual title to the Franklin Boulevard property since 1994, but it was held by the Hatchetts as tenants by the entirety when the federal tax lien first attached in 1978. The Hatchetts held the Cyclone property as tenants by the entirety until it was conveyed by warranty deed to the Jarretts on August 19, 1991.

On November 21, 1994, the Hatchetts commenced a wrongful levy action in the district court pursuant to 26 U.S.C. § 7426 (2002) to enjoin the tax sale of the four parcels of real estate and the seizure of the mortgage payments due. The district court entered two stipulated orders, on December 7, 1994 and June 23, 1995, enjoining the IRS from conducting the public auction or levying on the pending mortgage payments until the propriety of the levies was determined. On June 25, 1996, Magistrate Judge Donald A. Scheer issued two orders, consistent with his bench rulings: (1) an order granting the Hatchetts' Petition to Quash the

Government's request for a number of documents from 1972 to the present; and (2) an order granting the Government's motion to amend its answer to the Hatchetts' complaint and assert fraudulent conveyance as an affirmative defense. The district court issued a Memorandum Opinion and Order on February 28, 1997, reversing the two orders of the magistrate judge.

On March 31, 2000, the district court entered a judgment deciding the cross-motions for summary judgment filed by the Hatchetts and the Government. The court granted the Hatchetts' summary judgment motion and denied the Government's motion with respect to the West Hickory, Franklin Boulevard, South Saginaw, and Cyclone properties; the court granted the Government's summary judgment motion and denied the Hatchetts' motion with respect to the Bloomfield Township property. In its decision to grant the Hatchetts summary judgment, the district court relied on our decision in *Craft v. United States*, 140 F.3d 638 (6th Cir. 1998) ("*Craft I*") and held that the Government was not entitled to levy property held in tenancies by the entirety. This timely appeal followed on June 1, 2000.

## II. DISCUSSION

### A. Standard of Review

This Court reviews the district court's summary judgment decision *de novo*. *See Watkins v. Battle Creek*, 273 F.3d 682, 685 (6th Cir. 2001). Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). Summary judgment is appropriate if a party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In deciding a motion for summary judgment, the court must view the factual evidence and draw all reasonable inferences in favor

of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party must set forth specific facts showing that there is a genuine issue for trial. A genuine issue for trial exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986).

### B. Applicability of *United States v. Craft*

On March 16, 2001, this Court issued an opinion on the appeal from its remand of *Craft I* and again held that the Government was unable to levy property held as a tenancy by the entirety. *Craft v. United States*, 233 F.3d 358 (2001) ("*Craft II*"). However, in 2002 the Supreme Court granted certiorari on *Craft II* and reversed the decision of this Court. The Supreme Court held that property titled as a tenancy by the entirety could be levied by the Government. *United States v. Craft*, 122 S. Ct. 1414, 1420 (2002) ("*Craft*").

Sandra Craft was the wife of a delinquent taxpayer, Don, and she and her husband owned property as tenants by the entirety under Michigan law. *Craft I*, 140 F.3d at 639. In 1988, the IRS filed a notice of federal tax lien under 26 U.S.C. § 6321 (2002) on all of Don's property, including the entireties property, due to a liability of $482,446.73 in unpaid taxes. *Id.* After the lien was filed, the Crafts transferred the entireties property to Sandra by way of a quitclaim deed, in exchange for $1.00. *Id.* When Sandra attempted to sell the property in 1992, the federal lien was discovered. *Id.* at 640. The IRS agreed to release the lien on the property and allow the sale to go forward conditioned on Sandra's placing half the proceeds of the sale into an escrow account until a court decided the nature and extent of the Government's interest in the property. *Id.* In 1993, Sandra brought an action in the district court to quiet title to the proceeds being held in the escrow account. *Id.*

In the district court, the Government maintained that the lien attached to the property despite the fact that the Crafts held it as tenants by the entirety. *Id.* The district court

rejected that argument and instead held that the tenancy by the entirety was terminated when the Crafts executed the quitclaim deed. *Id.* The court concluded that each spouse momentarily held a one-half interest in the property and that the tax lien attached to Don's interest for that brief moment. *Id.*

On appeal, we rejected the notion that Don held a transitory one-half interest in the property when the property was conveyed to Sandra. Relying principally on our decisions in *Cole v. Cardoza*, 441 F.2d 1337 (6th Cir. 1971) and *United States v. Certain Real Property Located at 2525 Leroy Lane*, 972 F.2d 136 (6th Cir. 1992), we held that under Michigan law, a spouse does not possess a separate interest in the entireties property and therefore, the tax lien could not attach to the entireties property. *Id.* at 643-44. On remand, the district court conducted a bench trial and held that Don had committed fraud by making several mortgage payments on the property while claiming to be insolvent. *Craft II*, 233 F.3d at 363. Both parties appealed the decision, with the Government again claiming that its lien attached to the taxpayer's interest in the entireties property, and the case was heard by this Court for a second time. Applying the doctrines of the law of the case and the law of the circuit, we held that the panel's decision in *Craft I* must stand and that the federal tax lien did not attach to the entireties property. *Id.* at 369.

The Supreme Court granted certiorari to "consider the Government's claim that respondent's husband had a separate interest in the entireties property to which the federal tax lien attached." *Craft*, 122 S. Ct. at 1420. In a six to three decision, the Supreme Court reversed and remanded the decision of this Court. The Supreme Court began its analysis by using the common idiom of a "bundle of sticks" to describe property interests. *Id.* It described the relationship between state and federal law in the following terms: "State law determines only which sticks are in a person's bundle. Whether those sticks qualify as 'property' for purposes of the federal tax lien statute is a question of federal law." *Id.* The Court held that "despite the [state law fiction that a tenant by

the entirety has no separate interest in entireties property] each tenant possesses individual rights in the estate sufficient to constitute 'property' or 'rights to property' for the purposes of the lien . . . ." *Id.* at 1419. The Court examined the individual rights created under Michigan law with respect to entireties property and concluded that those rights included:

> [T]he right to use the property, the right to exclude third parties from it, the right to a share of income produced from it, the right of survivorship, the right to become a tenant in common with equal shares upon divorce, the right to sell the property with the respondent's consent and to receive half the proceeds from such a sale, the right to place an encumbrance on the property with the respondent's consent, and the right to block respondent from selling or encumbering the property unilaterally.

*Id.* at 1422. The Court also noted that the most essential property rights granted by Michigan -- the rights to use the property, to receive income produced by it, and to exclude others from it -- alone constituted rights sufficient to subject a delinquent taxpayer's interest in an entireties property to a federal tax lien. *Id.* at 1423.

Emphasizing that the "interpretation of 26 U.S.C. § 6321 is a federal question," the Supreme Court reasoned that "if neither [the husband nor the wife] had a property interest in the entireties property, who did? This result not only seems absurd, but would also allow spouses to shield their property from federal taxation by classifying it as entireties property, facilitating abuse of the federal tax system." *Id.* at 1424, 1425.

With this decision, the Supreme Court unequivocally stated that the language in § 6321 allowing the Government to place a lien upon "all property and rights to property, whether real or personal," included the right to place federal tax liens on properties held as tenancies by the entirety. Furthermore, the inclusion of entireties property in the definition of "all property and rights to property" in § 6321 is directly applicable to § 6331(a), which allows for the Government to

collect unpaid taxes by administrative levy of "all property and rights to property . . . belonging to such person or on which there is a lien . . . ." The scope of the federal tax lien and the scope of the levy are identical and interests subject to a federal lien are also subject to an administrative levy. Accordingly, the Government in this case is able to levy against and seize the West Hickory, Franklin Road, and South Saginaw properties, as well as the Cyclone mortgage payments, all held by the Hatchetts as tenants by the entirety.

### C. Retroactive Application of *United States v. Craft*

The Hatchetts argue that even if *Craft* is applicable, it should not be applied retroactively. As support for this argument, the Hatchetts offer *Chevron Oil Co. v. Huson*, 404 U.S. 97 (1971), which announced that a three-prong balancing test should be used in deciding whether a new principle of law should be applied retroactively. The Hatchetts argue that under the *Chevron Oil* balancing test, retroactive application of *Craft* would have "far-reaching untoward effects upon many, including tax professionals and the title industry." Additionally, citing to one of the dissents in *Craft*, the Hatchetts argue that there has been a general reliance in this country, including within the IRS, on the fact that the Government is unable to levy against property held as a tenancy by the entirety. These arguments are based on an incorrect understanding of current Supreme Court precedent.

In *Harper v. Virginia Department of Taxation*, 509 U.S. 86 (1993), the Supreme Court held that its decision in *Davis v. Michigan Department of Treasury*, 489 U.S. 803 (1989), applied retroactively to retired federal employees seeking refunds for taxes imposed on their federal retirement benefits by the state of Virginia. 509 U.S. at 89-90. The Court abandoned the balancing test articulated in *Chevron Oil*, developing a new standard for determining retroactivity in civil cases:

> [O]ur decision today makes it clear that "the *Chevron Oil* test cannot determine the choice of law by relying on the equities of the particular case" and that the federal law

applicable to a particular case does not turn on "whether [litigants] actually relied on [an] old rule [or] how they would suffer from retroactive application" of a new one.

*Id.* at 95 n.9 (quoting *James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, 543 (1991) (Souter, J.)); *see also In re Federated Dep't Stores, Inc.*, 44 F.3d 1310, 1317 (6th Cir. 1995) (recognizing that *Chevron Oil* has been overruled by *Harper*). The Court in *Harper* held:

> When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule.

509 U.S. at 97; *see also United States v. Real Prop. Located at 1184 Drycreek Rd., Granville, Oh. 43023*, 174 F.3d 720, 727 (6th Cir. 1999) (noting that *Harper* mandates the application of a new Supreme Court case decided while the present case was on direct appeal). Moreover, the Court in *Harper* invoked the Supremacy Clause and rejected Virginia's argument that states have the ability to limit the retroactive operation of federal law. 509 U.S. at 100 ("Whatever freedom state courts may enjoy to limit the retroactive operation of their own interpretations of state law[,] . . . cannot extend to their interpretations of federal law.") (citations omitted); *see also Drye v. United States*, 528 U.S. 49, 57 (1999) ("[F]ederal, not state [law] control[s] the ultimate issue whether a taxpayer has a beneficial interest in any property subject to levy for unpaid federal taxes."); *United States v. Rodgers*, 461 U.S. 677, 678-79 (1983) (holding that the Supremacy Clause allows the Government to "sweep aside state-created exemptions" to the collection of federal taxes and apply federal law).

The Supreme Court detailed the process for consideration of retroactivity in *Reynoldsville Casket Co. v. Hyde*, 514 U.S. 749 (1995), stating that:

[W]hen (1) the Court decides a case and applies the (new) legal rule of that case to the parties before it, then (2) it and other courts must treat that same (new) legal rule as "retroactive," applying it, for example, to all pending cases, whether or not those cases involve predecision events.

514 U.S. at 752.

Applying *Reynoldsville Casket*, we find that first, *Craft* announces a new rule of federal law. Several federal and state courts, including our Court, as well as the IRS, had assumed that entireties property was excluded from the definition of "all property and rights to property" as defined by the tax code. *See, e.g.*, *Craft*, 122 S. Ct. at 1431-32 (Thomas, J., dissenting) (listing cases). Therefore, the result in *Craft* is that a new rule of federal law was announced. Also, the Court applied the rule in *Craft* to the parties before it. In holding that the Government was authorized to attach liens to entireties property, the Court remanded the decision in *Craft* to this Court to determine the exact valuation of the taxpayer's interest in the entireties property and the amount owing to the Government. *Id*. at 1426. Second, the present case was pending on direct review when the Supreme Court's decision in *Craft* was rendered. Indeed, the Government's primary argument to this Court on appeal depended on the outcome of *Craft II*, which was pending review in our Court at the time the Government's appeal was filed, and any subsequent review by the Supreme Court. Accordingly, *Craft* applies retroactively to this case.

## D.  Right of the Government to Sell the Levied Property

The Hatchetts argue in the alternative that, even if the Government may levy the entireties property, the result in *Craft* does not compel the Government to sell the property. They briefly analogize their situation to that of a partnership, stating that "while the Government's lien can attach to an individual partner's interest in a partnership, it does not attach to the partnership assets, and the Government cannot sell those partnership assets." Citing to *Drye*, the Hatchetts also

assert that the Government may levy merely on Elbert's "right of use and right of exclusion, subject to his wife's right of use and exclusion." These arguments are wholly without merit.

First, the majority in *Craft* specifically rejected the argument advanced in the dissents by Justices Scalia and Thomas that "the conclusion that the husband possessed an interest in the entireties property to which the federal tax lien could attach is in conflict with the rules of tax liens relating to partnership property." *Craft*, 122 S. Ct. at 1424. The Court stated that "[t]here is, however, a difference between the treatment of entireties property and partnership assets." *Id.* Accordingly, the Hatchetts' attempt to equate entireties property to partnership assets is an argument that already was considered and rejected by the Supreme Court.

Second, applying *Craft* to this case leads to the rule that, pursuant to § 6331, the Government may levy upon property held by a delinquent taxpayer as a tenancy by the entirety. Section 6331(b) specifically states that:

> (b) Seizure and sale of property.- The term "levy" as used in this title includes the power of distraint and seizure by any means. Except as otherwise provided in subsection (e), a levy shall extend only to property possessed and obligations existing at the time thereof. *In any case in which the Secretary may levy upon property or rights to property, he may seize and sell such property or rights to property (whether real or personal, tangible or intangible)*.

(emphasis added). Furthermore, § 6331(l) states that "[f]or proceedings applicable to sale of seized property, see section 6335." Title 26 U.S.C. § 6335(c) (2002) states that "[i]f any property liable to levy is not divisible, so as to enable the Secretary by sale of a part thereof to raise the whole amount of tax and expenses, the whole of such property *shall* be sold." (emphasis added).

The language of the statutes is clear. The power to levy includes the power to seize and sell these properties as

prescribed by § 6335; property that cannot be divided in order to satisfy the whole of taxes and expenses shall be sold in its entirety. *Craft* allows the Government to levy upon the West Hickory, Franklin Boulevard, and South Saginaw properties held by the Hatchetts as tenants by the entirety. In 1998, the taxable value of these properties was estimated as follows: (1) West Hickory at $544,400, (2) Franklin Boulevard at $19,720; and (3) South Saginaw at $60,480. Elbert's outstanding tax indebtedness in excess of $8,000,000 far exceeds the value of his interests in the entireties properties. Accordingly, the Government is entitled to sell the whole of the properties and collect a portion of the proceeds pursuant to § 6335(c).

The Hatchetts, relying on the Supreme Court's decision in *Rodgers*, also argue that even if the Government is entitled to sell the entireties property, we should remand the case to the district court for consideration by that court of whether the sale should be allowed to go forward. The Hatchetts' reliance on *Rodgers* is misplaced. The Court in *Rodgers* decided that a Texas homestead law did not prevent the Government from forcing the sale of a family house to satisfy tax indebtedness. 461 U.S. at 680. The Government chose to pursue the taxpayer in *Rodgers* under 26 U.S.C. § 7403 (2002), which authorizes the Government to pursue a taxpayer by filing a civil action in a district court for the payment of delinquent taxes. In a proceeding under § 7403, the district court adjudicates all the matters involved, makes a final determination of the claims, and decrees a sale of the property if the Government's claim is established. § 7403 (c). In explaining that a court in a § 7403 proceeding is charged with exercising its discretion regarding the sale of levied property, the Court in *Rodgers* held that several factors should be considered by the district court in deciding whether to authorize the forced sale. 461 U.S. at 710-11.

As the Court explained in *Rodgers*, a § 7403 proceeding is wholly different from an "administrative levy under 26 U.S.C. § 6331." 461 U.S. at 682. An action under § 6331, the Court noted, is "unlike the procedure described in § 7403, [and]

does not require any judicial intervention, and it is up to the taxpayer . . . to go to court if he claims that the assessed amount is not legally owing." *Id.* at 682-83. The action in this case is an administrative levy pursuant to § 6331 and therefore *Rodgers* has absolutely no application here. Accordingly, under *Craft* the Government is able to sell the Hatchetts' entireties properties and collect the mortgage payments.

### E. The Government's Alternative Theories

The Government argues that the district court erred in refusing to allow it to present three alternative theories of defense to the Hatchetts' wrongful levy action. The Government argues that if there is sufficient evidence to support these three theories, it would be allowed to retain a higher percentage of the proceeds from the sale of the entireties property.

#### 1. Fraudulent conveyance theory

In 1996, pursuant to Federal Rule of Civil Procedure 15(a), the Government filed a motion to amend its answer to the Hatchetts' wrongful levy complaint in order to assert the affirmative defense of fraudulent conveyance. Under this theory, the Government argued that Elbert, while insolvent, used his individual funds to purchase and enhance property that he placed in entireties ownership in order to prevent his creditors from attaching it. A magistrate judge issued an order granting the Government's motion to amend its answer. However, in a February 28, 1997 Memorandum and Opinion, the district court reversed the order of the magistrate judge and refused to allow the Government to present its theory of fraudulent conveyance. The district court also ruled on the Hatchetts' Motion to Strike Fraudulent Conveyance Defense and for Summary Judgment and granted the Motion to Strike and the Motion for Summary Judgment as to the fraudulent conveyance issue. The court discussed three reasons for its holding: (1) the Government lacked standing to bring the theory; (2) introduction of the theory was barred by res

judicata; and (3) introduction of the theory was barred by laches.

We review a denial of a motion to amend the pleadings for abuse of discretion. *Fisher v. Roberts,* 125 F.3d 974, 977-78 (6th Cir. 1997); *LRL Props. v. Portage Metro Hous. Auth.*, 55 F.3d 1097, 1104 (6th Cir. 1995). However, if the court denies the motion on grounds that the motion would be futile, the denial is reviewed *de novo. Parry v. Mohawk Motors of Mich., Inc.,* 236 F.3d 299, 306 (6th Cir. 2000); *LRL Props.*, 55 F.3d at 1104; *see also Dubuc v. Green Oak Township*, 312 F.3d 736, 743-44 (6th Cir. 2002). Because the district court's disposition of this issue is equivalent to a denial based on futility, we review the decision *de novo.* We disagree with all three of the reasons set forth by the district court and remand with instructions to grant the Government's motion to amend its answer.

*a. Standing*

The district court, relying in part on *Nat'l Tax Credit Partners, L.P. v. Havlik,* 20 F.3d 705, 708-09 (7th Cir. 1994), held that the Government lacked standing to assert the fraudulent conveyance defense. The court held that the bankruptcy trustee, appointed in September, 1990, had the exclusive authority to pursue a claim of fraudulent conveyance under 11 U.S.C. § 548 (2002) of the Bankruptcy Code. We disagree.

In September, 1992, the bankruptcy trustee filed a complaint against Elbert based upon a theory of fraudulent conveyance. However, on February 25, 1993, the trustee filed a motion to abandon its fraudulent conveyance action after determining that the liens filed in favor of the IRS and the State of Michigan exceeded the Hatchett's equity in the properties at issue. The trustee determined that because no funds would be available from the liquidation of properties for unsecured creditors, he should abandon the claim. In March, 1993 the trustee's fraudulent conveyance action was officially abandoned and the matter was settled in the Bankruptcy Court in April, 1993.

Section 548 of the Bankruptcy Code provides

**(a)(1)** The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily--
**(A)** made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted . . .

11 U.S.C. § 548 (a) (1993). Though the trustee has the exclusive right to bring an action for fraudulent conveyance during the pendency of the bankruptcy proceedings, the Bankruptcy Code does not extinguish the right of the Government to bring a state law action for fraudulent conveyance after the debtor receives a discharge in bankruptcy. In *Havlik*, the Seventh Circuit held that the right to recoup a fraudulent conveyance is exclusive to the trustee, and specifically noted that this right only attached "once a bankruptcy is under way." 20 F.3d at 709. The court said nothing about the right of individual creditors to pursue state law claims for fraudulent conveyance once the bankruptcy was discharged. In *Klingman v. Levinson*, 114 F.3d 620, 629 (7th Cir. 1997), the court held that bankruptcy proceedings only have the effect of imposing a temporary stay of a fraudulent conveyance action by the Government. The court in *Klingman* held that once the bankruptcy court issued findings on the matter, the Government could proceed on a state law fraudulent conveyance action in the district court. *See also Nat'l Am. Ins. Co. v. Ruppert Landscaping Co., Inc.*, 187 F.3d 439, 441 (4th Cir. 1999) (noting that an individual creditor can pursue fraudulent conveyance claims only after such a claim has been abandoned by the trustee); *Kathy B. Enter., Inc. v. United States*, 779 F.2d 1413, 1415 (9th Cir. 1986) (holding that once the bankruptcy proceedings are over, the IRS is able to pursue a collection action because such an action would not interfere with rights of other creditors); *Fed.*

*Deposit Ins. Corp. v. Davis* 733 F.2d 1083, 1085 (4th Cir. 1984) ("Once a bankruptcy case has been closed, creditors having unavoided liens on fraudulently conveyed property can pursue their state law remedies independently of the trustee in bankruptcy."). Accordingly, because the bankruptcy proceedings are over, the Government has standing to assert its fraudulent conveyance theory.

### b. Res judicata

The district court also held that the Government's fraudulent conveyance claim was barred by the doctrine of res judicata. With a cursory explanation, the district court held that the Bankruptcy Court's approval of a settlement regarding the fraudulent conveyance issue bars any further litigation on the matter. We disagree. A claim in a second action is barred under the doctrine res judicata if: (1) the first action resulted in a final judgment on the merits; (2) both actions are between the same parties; (3) the issue in the second action should have been litigated in the first action; and (4) the claim is identical in both actions. *Wilkins v. Jakeway*, 183 F.3d 528, 532 (6th Cir. 1999). The action at issue here does not even meet the first requirement of the doctrine of res judicata. The bankruptcy trustee abandoned any action to recover the properties based on a theory of fraudulent conveyance. Accordingly, there was no final judgment on the merits regarding the issue of fraudulent conveyance and the doctrine of res judicata does not apply.

### c. Laches

Finally, the district court held that the Government's fraudulent conveyance defense was barred by laches. In its summary disposition of the issue, the district court relied on *S.E.R., Jobs for Progress, Inc. v. United States*, 759 F.2d 1 (Fed. Cir. 1985) and 11 U.S.C. § 546 (2002). This reliance was misplaced. It is well established that the Government generally is exempt from the consequences of its laches. *See United States v. Summerlin*, 310 U.S. 414, 416 (1940) ("It is well settled that the United States is not bound by state statutes of limitation or subject to the defense of laches in

enforcing its rights."); *Guar. Trust Co. v. United States*, 304 U.S. 126, 132 (1938) (noting the continuing vitality of the rule that the sovereign is exempt from its own laches); *United States v. Peoples Household Furnishing, Inc.*, 75 F.3d 252, 254 (6th Cir. 1996) ("The ancient rule . . . 'that the sovereign is exempt from the consequences of its laches, and from the operation of statutes of limitations' - has enjoyed continuing vitality for centuries.") (citation omitted); *United v. Weintraub*, 613 F.2d 612, 618 (6th Cir. 1979) ("The principle [that the Government is exempt for the consequences of its own laches] is well established in this country."). However, the Government may be subject to laches in certain types of action. *See S.E.R.*, 759 F.2d at 6-7. The court in *S.E.R.* merely held that the doctrine of laches may be applicable against the Government in the limited exception of contract cases, saying nothing regarding any other type of action involving the Government. *Id.* at 8. Accordingly, there is no precedent holding that the Government is subject to its own laches in tax collection actions.

Under § 546, a fraudulent conveyance action must be commenced within two years of the appointment of the Chapter 7 trustee. Because the bankruptcy trustee was appointed on September 10, 1990, the court reasoned that the Government's fraudulent conveyance action is untimely. However, the statute of limitations in § 546 applies only to actions by trustees. *See Weintraub*, 613 F.2d at 618 ("While the general rule . . . is that the sovereign is exempt from the operation of statutes of limitations, an exception to that general rule exists when the sovereign (through the legislature) expressly imposes a limitation period upon itself."). As we have discussed, this state law action by the Government for fraudulent conveyance commenced after the discharge of the bankruptcy and has nothing to do with the rights of the trustee. Accordingly, the statute of limitation set forth in § 546 is irrelevant to the Government's action and the general rule that the Government is exempt from the doctrine of laches applies in the instant case.

Furthermore, we reverse the district court's decision to grant the Hatchett's Motion to Strike Fraudulent Conveyance Defense. We review the grant of a motion to strike a pleading for abuse of discretion. *See, e.g., Fisher,* 125 F.3d at 977-78 (6th Cir. 1997); *LRL Prop.*, 55 F.3d at 1104. For the reasons stated above, we find that the district court abused its discretion in granting the Hatchett's motion to strike.

### 2. *Nominee and lien tracing theories*

The Government also wanted to argue at the trial level that its levies were proper under both a nominee theory and a lien tracing theory, and sought to introduce evidence in support of these theories. Under the nominee theory, the Government argues that other individuals are holding three properties and rights to the mortgage payments as nominees of Elbert. The Government argues that Elbert shielded the properties and payments from his tax liabilities with these title arrangements. Under the lien tracing theory, the Government argues that since it had a lien on Elbert's money, it is entitled to place a lien on the properties improved or purchased with that money.

In a March 31, 2000 Order Denying Defendants' Motion for Recusal and Granting in Part and Denying in Part Cross-Motions for Summary Judgment, *Hatchetts v. Internal Revenue Serv.*, 126 F. Supp. 2d 1038 (E.D. Mich. 2000), the district court ruled that the Government's nominee and lien tracing theories were unpersuasive. The court based its decision on the fact that, under *Craft I*, we held that taxpayers did not hold any separate interest in property held as a tenancy by the entirety to which a lien can attach.

This Court reviews the district court's summary judgment decision *de novo*. *See Watkins*, 273 F.3d at 685. In light of the Supreme Court decision in *Craft*, both theories are relevant in determining the Government's interest in the entireties properties and mortgage payments at issue. Accordingly, the Government is entitled to present its nominee and lien tracing theories on remand in order to determine the exact value of the Government's interests.

### III. CONCLUSION

For the reasons stated, we **REVERSE** the decision of the district court granting Appellees' motion for summary judgment, and **REMAND** to the district court for further proceedings in accordance with this opinion. Furthermore, we **REVERSE** and **REMAND** the district court's denial of the Government's Motion to Amend its answer to include a fraudulent conveyance defense, and we **REVERSE** and **REMAND** the district court's grant of summary judgment for the Hatchetts on the Government's nominee and lien tracing theories.