**In re TWO SPRINGS MEMBERSHIP CLUB, Debtor.**

**Elaine B. Greaves, Plaintiff,**

v.

**Office of the Delaware Attorney General, et al., Defendants.**

**Bankruptcy No. 04–44837.
Adversary No. 06–4112.**

United States Bankruptcy Court,
N.D. Ohio,
Eastern Division.

May 5, 2009.

---

Richard G. Zellers, Richard G. Zellers & Associates, Canfield, OH, for Debtor.

Andrew W, Suhar, Suhar & Macejko, LLC, Youngstown, OH, for Plaintiff.

Douglas Snoeyenbos, US Justice Dept, Washington, DC, for Defendants.

## MEMORANDUM OPINION REGARDING UNITED STATES' MOTION TO ALTER OR AMEND UNDER BANKRUPTCY RULE 9023

KAY WOODS, Bankruptcy Judge.

The United States, on behalf of the Internal Revenue Service Bankruptcy Rule 9023 ("Motion to Amend") (Doc. # 168) on April 17, 2009. The Motion to Amend is based on Federal Rule of Bankruptcy Procedure 9023, which incorporates Federal Rule of Civil Procedure 59. Rule 59 is captioned "New Trial; Altering or Amending a Judgment" and provides that "[a]fter a nonjury trial, the court may, on motion for a new trial, open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new ones, and direct the entry of a new judgment." FED.R.CIV.P. 59(a)(2). The Government specifies that the Motion to Amend "concerns only certain perceived errors of law in the decision, and does not waive the [G]overnment's right to appeal on other grounds." (Mot. to Amend at 1.) The Motion to Amend requests this Court to amend the Memorandum Opinion Regarding Trial (Doc. # 165) and Order Regarding Trial (Doc. # 166) (collectively, "Decision") entered by the Court on April 9, 2009, after a one-half day trial on February 23, 2009. The Court held a hearing on the Motion to Amend on May 1, 2009, at which the Government, Coast,[1] and the Trustee were represented by counsel.[2]

Although the Motion to Amend purports to address perceived errors of law, the Government actually makes arguments that are not supported by facts in the record and asserts entirely new legal arguments that were not made either prior to or at trial. For the reasons set forth below, this Court declines to alter or amend the Decision.

Before the Court addresses each of the Government's three arguments in the Motion to Amend, the Court first will discuss whether the Government has a basis for making a Rule 59 Motion rather than simply appealing the Decision. The Government argues that it is "appropriate" for this Court to amend the Decision because the Government "did not previously understand" that it still needed to prove its alter

1. Capitalized terms not otherwise defined herein have the same meaning as used in the Decision.

2. Coast filed Reply of Camp Coast, Inc. and Affinity Group, Inc. ("Coast") to Motion to Alter or Amend Judgment Under Bankruptcy Rule 9023 (Doc. # 171) on April 29, 2009, and the Government filed United States' Reply to Coast' [sic] Response to United States' Motion to Alter or Amend Under Bankruptcy Rule 9023 (Doc. # 172) on April 30, 2009.

Based on this Court's Memorandum Re: Bankruptcy Court Policies and Procedures, dated July 15, 2008, the Court has not read or considered either Document # 171 or # 172, and neither document is addressed in this Opinion. The Memorandum is available on the Court's website and states, "Absent direction from the Court, the non-moving party should not respond to a motion for reconsideration, and the motion should not be noticed." (Memo at 5.)

ego claim. The Court rejects this argument.

Shortly before the scheduled trial, counsel for the Government made a last ditch motion for leave to file a motion for summary judgment based on judicial estoppel (Doc. # 145). The facts underlying the legal argument for judicial estoppel were known or should have been known to the Government for many years prior to the time the Government moved this Court for leave to file a second motion for summary judgment. Despite the Government's intimate involvement with trying to pierce the corporate veils of various Novelli Group entities and prior litigation involving the competing claim of Coast, the Government failed to make its argument for judicial estoppel until less than two months prior to trial.

Despite the late filing, the Court granted the Government leave to file the motion for summary judgment. The Court then addressed the issue in Memorandum Opinion and Order ("Judicial Estoppel Order") (Doc. ## 156 and 157) dated February 9, 2009, which granted the motion in part and denied the motion in part. In responding to the motion for summary judgment (Doc. # 151), Coast had argued that it should not be judicially estopped for several reasons, chief among them that the Orange County Court's ruling was based on entirely different facts and legal issues. Coast argued that the Orange County Action was a breach of contract action brought by certain Novelli Group entities. The Orange County Court found in favor of Coast and then awarded attorney fees jointly and severally against each of the plaintiffs, finding that the plaintiffs had unclean hands. Thus, Coast argued that the facts in the Orange County Action did not support the alter ego claim that the IRS was attempting to establish.

In the Judicial Estoppel Order, this Court expressly noted, "However, the issue before the Court is not whether the Orange County Court's finding of alter ego is applicable to the instant case, but whether Coast is judicially estopped from arguing that Travel America and Revcon [Nevada] are not alter egos. The Government still must meet its prima facie burden, but estopping Coast from presenting alternate interpretations of the alter ego factors will allow all parties to focus on the remaining disputed issues in this case." (Judicial Estoppel Order at 10.) The Court made it very clear—in writing and orally—that the Government still bore the burden of proof regarding all factors to establish alter ego. This Court ruled that Coast was merely estopped from arguing a different interpretation of those facts. The Court will not countenance the Government's contention that its failure to establish all elements of alter ego is somehow excused because of its failure to understand the Court's ruling in the Judicial Estoppel Order.

The Government further argues that the Court "overlooked or misapprehended" the Government's legal argument regarding alter ego by stating that "although the [G]overnment argued that *fraud* is not essential to an alter ego claim under federal common law, we have always assumed that the [G]overnment had to show some injustice or inequity that would be redressed by an alter ego determination, no matter what choice of law is applied." (Mot. to Amend at 4, n. 2.) Whether or not the Court understood the *reason* behind the Government's insistence upon the application of federal common law, the Court expressly found that the Government failed to establish *any injustice* or inequity that required a finding of alter ego between Revcon Nevada and Travel America. (Decision at 35, 38.)

■ Although it is clear that the Government believes the Court's Decision is flawed, the Government has stated no basis for seeking alteration or amendment of that Decision, as opposed to appealing the Decision. The Government obviously disagrees with this Court's analysis and application of the law, but the Government has failed to bring to the Court's attention any newly discovered facts, a change in controlling law, or any clear error of law that would cause the Court to amend the Decision. As the Sixth Circuit Court of Appeals has stated, "A district court may grant a Rule 59(e) motion to alter or amend judgment only if there is: '(1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice.' " *Henderson v. Walled Lake Cons. Schools,* 469 F.3d 479, 496 (6th Cir.2006), *quoting Intera Corp. v. Henderson,* 428 F.3d 605, 620 (6th Cir. 2005).

■ Indeed, it is the Government that misunderstands the law, confusing judicial estoppel with res judicata and collateral estoppel—neither of which doctrines were raised at or prior to trial. The Court should not be subjected to new theories simply because, after trial, a litigant does not like the decision rendered. As the Sixth Circuit Court of Appeals recently stated: "As a threshold matter, we must determine the scope of the record before the bankruptcy court when it ruled on the United States' motion for partial summary judgment on liability. We do so because our role is 'to review the case presented ... rather than a better case fashioned after ... an unfavorable order.' " *U.S. Bank Nat'l Assoc., Trustee, v. U.S. Env. Prot. Agency,* 563 F.3d 199, 208 (6th Cir. 2009) *(quoting Barner v. Pilkington N. Am., Inc.,* 399 F.3d 745, 749 (6th Cir. 2005)). Here, by filing the Motion to Amend, the Government is improperly trying to fashion a new and better case than the case it made at trial.

## I. GOVERNMENT'S FIRST ARGUMENT

The Government's first argument is that the Court erred in ruling that the Government failed to prove that Revcon Nevada and Travel America are alter egos of each other. The Government's argument can be summarized as follows: (i) Coast was judicially estopped from arguing that Revcon Nevada and Travel America were not alter egos; (ii) Coast has asserted a general unsecured claim against Debtor in the amount of $3,880,039.00 ("Coast's Claim"), which equates to approximately 99% of the total pre-petition general unsecured claims against Debtor's estate; (iii) the Decision that Revcon Nevada and Travel America are not alter egos permits Coast to receive a distribution from Debtor for Coast's Claim; and (iv) allowing Coast to receive a distribution from Debtor's estate will violate the "policies that the Sixth Circuit has held underlie the doctrine of judicial estoppel[.]" (Mot. to Amend at 2.)

■ The "policy" of the equitable doctrine of judicial estoppel is to keep a party from playing "fast and loose" with the courts. It has been developed to preclude a party who has asserted one position in a court, which has been adopted by that court, from asserting a contrary position later—either in the same proceeding or before a different court. The Government does not seem to understand the limited nature of the doctrine of judicial estoppel because it argues that "the judicial estoppel doctrine should not be applied *merely* to prevent the party to be estopped from disputing a contention by another party on which the party to be estopped itself has prevailed in another lawsuit." (Mot. to Amend at 5 (emphasis added).) Yet, this

"mere" application is the essence and extent of the doctrine of judicial estoppel.

■■■■ The Government makes a totally unsupported and unsupportable argument that "the doctrine of judicial estoppel is intended to prevent a party from *benefitting* from a position that is inconsistent with the one on which it has already prevailed in the previous proceeding." (*Id.* at 6.) Although the Government cites *In re Coleman*, 426 F.3d 719, 728–29 (4th Cir. 2005) in support of this contention, the quoted passage does not support the Government's overly-broad application of the doctrine of judicial estoppel. The doctrine of judicial estoppel precludes a party from taking an inconsistent position; it does not preclude a party from benefitting by a court decision in which the party has *not* taken such inconsistent position. The *Coleman* Court stated that a party cannot "benefit from deliberate manipulation of the court," but it says nothing about the outcome of a case when the party does not take any position regarding the issue. Indeed, none of the cases cited by the Government in support of its first argument stand for the proposition that Coast cannot benefit from the Court's ruling if it has abided by the Judicial Estoppel Order (as it did).

The Government does not contend—nor could it—that, despite the Judicial Estoppel Order, Coast argued that Revcon Nevada and Travel America were not alter egos. Coast did not make any such argument, and the Court did not consider any argument that Revcon Nevada and Travel America were not alter egos of each other. The Court carefully considered the Government's evidence and found it wanting. Despite application of the equitable doctrine of judicial estoppel, the Government

failed to make out a prima facie case of alter ego regarding Revcon Nevada and Travel America.

The Government states that its "lien claim for assessments in the name of Travel America should be considered unchallenged" because Coast was estopped from making a counter argument and Trustee did not take a contrary position on the issue. (Mot. to Amend at 7, n. 5.) Apparently, based upon this lack of "challenge," the Government believes that it "wins" the argument no matter how scant the case it presents. This is simply not true. The Government did not and does not have a direct lien against the Sale Proceeds because it did not and does not have a direct lien against the Campground, which was property of Debtor.[3] The Court's Decision held that Debtor and Revcon Nevada were alter egos of each other and, thus, the Government's lien for tax assessments against Revcon Nevada is a lien against the Sale Proceeds. The Government does not challenge either of these findings or holdings. The Government's only challenge is to the Court's determination that, because Revcon Nevada and Travel America are not alter egos, the Government lien in the name of Travel America does not attach to the Sale Proceeds. The Government has a lien against the Sale Proceeds for the Travel America taxes ONLY if it establishes that Travel America and Revcon Nevada are alter egos of each other. This was the Government's burden to prove. The Government failed to carry that burden, as set forth in the Decision.

■■■■ The Government's first argument is not supported by case law. The doctrine of judicial estoppel was created to keep a party from playing fast and loose

---

**3.** The Government's lien in the name of Debtor has previously been satisfied from the Sale Proceeds.

482

with the courts, not to permit a different party to escape meeting its burden to prove all elements of its case.[4] Here, Coast took NO position regarding whether Revcon Nevada and Travel America were alter egos of each other. Where, as here, Coast took no position on the issue in question, the fact that Coast may receive a distribution from Debtor's estate on its general unsecured claim is not the kind of "benefit" that the doctrine of judicial estoppel was designed to prevent.

## II. THE GOVERNMENT'S SECOND ARGUMENT

The Government's second argument is based on what "could" have happened, rather than the facts before the Court at trial. The Government asserts that if it had brought a fraudulent transfer action in California after Coast had received its judgment, *then* "Coast would have been judicially estopped from denying that Revcon Nevada and Travel America were alter egos of each other, with the consequence that Revcon Nevada was liable for Travel America's unpaid taxes." (Mot. to Amend at 8). The Government then argues that since it would have prevailed under those circumstances, that it must prevail here.

■ There are many problems with the Government's argument—not the least of which is that it is based on what could have happened, but which did not. The Government argues that application of fraudulent transfer remedy is not precluded merely because the Revcon Trustee failed to bring an action under § 544(b). In making this argument the Government

relies on *Hatchett v. United States*, 330 F.3d 875 (6th Cir.2003). The Government recognizes that the *Hatchett* case involves a fraudulent conveyance cause of action that was abandoned—rather than fully administered—by the bankruptcy trustee, but the Government insists that the Sixth Circuit's reasoning is not limited to circumstances where a claim for fraudulent transfer has been abandoned.

This Court disagrees with the Government's analysis. The Government wholly ignores the fact that the Revcon Trustee *settled and fully administered* the alleged fraudulent transfer cause of action that the Revcon Nevada estate had against Debtor. As this Court set forth in the Decision, the Revcon Trustee filed a limited objection to the sale of the Campground based on his understanding that the Campground had been fraudulently transferred by Revcon Nevada to Debtor. (Decision at 2.) The Sale Order provided for Trustee to hold $33,000.00 in escrow to resolve the objection of the Revcon Trustee. (*Id.* at 3.) Subsequently, the Court entered an order that provided for the full settlement of the Revcon Trustee's claims for $33,000.00. (*Id.* at 4.) As this Court expressly noted:

[T]he Revcon Trustee asserted that Revcon Nevada fraudulently transferred the Campground to Debtor. The Revcon Trustee never (i) filed an action to avoid the transfer, and/or (ii) sought to bring either the Campground or the entire Sale Proceeds into the Revcon Nevada bankruptcy estate. However, on August 23, 2005, the Revcon Trustee

**4.** The Government argued at the Hearing that—in a traditional two-party action involving Coast and the Government—the Government would have prevailed on its position that Revcon Nevada and Travel America are alter egos based on Coast being judicially estopped. There is no basis to support the Government's contention. The Court first

notes that this is not a traditional two-party case. Next the Court notes that the Government's argument appears to be based on collateral estoppel, which is not applicable here because the issue and facts at issue in the instant case were not before—let alone decided by—the Orange County Court.

filed a proof of claim in Debtor's case, asserting an unsecured claim in an unknown amount based on "transfer of assets to debtor." The Revcon Trustee settled all claims relating to the allegedly fraudulent transfer for $33,00.00. Despite Coast's contention that the Revcon Trustee has abandoned any and all causes of action related to the alleged fraudulent conveyance of the Campground, this Court finds that, having settled such claims, the Revcon Trustee administered—rather than abandoned—them.

*Id.* at 4, n. 3.

The Sixth Circuit Court of Appeal's decision in *Hatchett,* which allowed the IRS to pursue a fraudulent transfer claim, was specifically based on a finding that "trustee's fraudulent conveyance action was officially abandoned." *Hatchett,* 330 F.3d at 885. The Sixth Circuit cited *"Nat'l Am. Ins. Co. v. Ruppert Landscaping Co., Inc.,* 187 F.3d 439, 441 (4th Cir.1999) (noting that an individual creditor can pursue fraudulent conveyance claims *only after such a claim has been abandoned by the trustee)." Hatchett,* 330 F.3d at 886 (emphasis added). There is no support for the Government's contention that the holding in *Hatchett* regarding survival of a fraudulent conveyance cause of action is not limited to circumstances where the cause of action has been abandoned by the Trustee.

The Government was served with and received notice [5] of: (i) Trustee's motion to sell the Campground, (ii) the Revcon Trustee's limited objection to the sale, and (iii) the Court's Order approving the settlement between Debtor and Revcon Trustee. At no time did the Government (or Coast) object to the amount of the settlement negotiated by the Revcon Trustee to settle all fraudulent conveyance claims. The Government is bound by the final order of this Court that approved the settlement between Trustee and the Revcon Trustee concerning the alleged fraudulent transfer of the Campground. Although the Government may now wish that it had voiced an objection to the Revcon Trustee's settlement of the fraudulent transfer claim for $33,000.00, it failed to take such action. The Government's attempt to rewrite history about what would have or could have occurred if other or different actions had been taken is not availing.

Moreover, the Government is wrong in its argument that, if the facts had played out differently and Revcon Nevada's transfer of the Campground to Debtor (which was recorded on April 25, 2001) had been avoided, the Government's tax assessment in the name of Travel America would have taken precedence over the Coast Judgment Lien. If the transfer had been avoided as a fraudulent conveyance, *then* it would have been as if the transfer had never occurred. If the transfer was avoided, Revcon Nevada would have been deemed to have been the owner of the Campground when Coast filed the Judgment Lien on October 15, 2001. The Government filed its Notice of Tax Lien on July 31, 2003. Coast's Judgment Lien—under those circumstances—would have been choate and would have been first in time over the Notice of Tax Liens filed by the Government. As pointed out in the Decision, a tax lien commences "no sooner than the filing of notice." (Decision at 24, *quoting United States v. McDermott,* 507 U.S. 447, 449, 113 S.Ct. 1526, 123 L.Ed.2d 128 (1993).)

---

**5.** The docket reflects that not only did Douglas Snoeyenbos, as counsel of record for the Government, receive notice, but that Internal Revenue Service was served at three separate locations, as well as the United States Attorney's Office and the Attorney General of the United States.

■ The remainder of the Government's second argument is a confusing jumble of arguments about res judicata and collateral estoppel—neither of which are applicable in the instant case.

■ Res judicata requires three elements, *none* of which are present here. These elements are: (i) the second action involves the same parties as the first action; (ii) the second action involves the same cause of action as the first; and (iii) the facts are the same in the two actions. The Orange County Action did not involve the Government, but instead was brought by certain Novelli Group entities against Coast. The Orange County Action was a contract lawsuit and did not deal with the collection of taxes or the question of tax liability. The facts before the Orange County Court were not the same as the facts before this Court. As a consequence, the Government's bald statement that "this Court would have been compelled to find that alter ego relationship under the doctrine of res judicata" (Mot. to Amend at 11) is not supported by the law and the facts. The Government argues that this Court has to give preclusive effect to the Orange County judgment. This Court agrees with that statement, but this Court has done so. The Orange County judgment awarded Coast attorney's fees in the amount of $3,880,039.00; this represents the basis for and is the amount of the Coast Claim. The Orange County judgment has not been attacked or challenged before this Court, and this Court has not failed to give it preclusive effect.

■ Like res judicata, the doctrine of collateral estoppel is not relevant to the instant case. Generally, the following elements must be established to apply the doctrine of collateral estoppel: (i) a final judgment on the merits in the previous case after a full and fair opportunity to litigate the issue; (ii) the issue must have been actually and directly litigated in the prior suit and must have been necessary to the final judgment; (iii) the issue in the present suit must have been identical to the issue in the prior suit; and (iv) the party against whom estoppel is sought was a party or in privity with a party to the prior action. *Gonzalez v. Moffitt (In re Moffitt),* 252 B.R. 916, 921 (6th Cir. BAP 2000). It is clear from the Orange County Court's opinion that the alter ego issue was not actually and directly litigated in that case. Furthermore, while the issue in both the Orange County Action and the instant case may be labeled "alter ego," the posture and circumstances of the two cases is so vastly different that the issue can hardly be considered "identical" in both cases. As a consequence, Coast would not be collaterally estopped regarding whether Revcon Nevada and Travel America are alter egos of each other. Finally, as this Court has stated repeatedly, the current case before this Court requires that any and all defendants must meet their respective prima facie burden in order to have their respective claim(s) considered for distribution.

All of the cases cited by the Government at page 11 of its Motion to Amend deal with res judicata or collateral estoppel—not judicial estoppel. Res judicata and collateral estoppel are not interchangeable with the doctrine of judicial estoppel. Neither res judicata nor collateral estoppel has any bearing in the instant case. At no time prior to or at trial did any party argue that res judicata or collateral estoppel applied.

## II. THE GOVERNMENT'S THIRD ARGUMENT

■ The third and final argument by the Government is possibly the most frustrating for this Court to address because it is based on alleged facts that are not in the

record and an argument not previously made. None of the currently alleged facts or arguments are newly discovered, they just simply do not exist in the record at trial.

First, the Government now argues that this Court should have applied the law of the state of California in determining whether Revcon Nevada and Travel America were alter egos. At no time did the Government argue for application of *any* state law; it consistently insisted that federal common law was applicable. Although Coast suggested California law as one of the choices for the Court to consider in determining if Debtor and Revcon Nevada (not Revcon Nevada and Travel America) were alter egos, Coast abandoned California state law in favor of Delaware state law for this issue. The Court spent a great deal of time analyzing the law that Coast and the Government had argued to be applied and determined that there were no fundamental differences between the elements that needed to be proved. In each case, some kind of fraud, something like fraud, or some kind of injustice was required before a finding of alter ego would be made. The Government appears to now argue that California has a more relaxed standard for finding alter ego and that the Government met that standard. However, the cases cited by the Government in footnote 13 of the Motion to Amend do not dispute the fact that California law requires some injustice in order to find alter ego.

The Government asserts that the Decision "appears at times to suggest that fraud is required, or to treat the required showing of 'injustice' as tantamount to fraud, and, at other times, to recognize that the scope of 'injustice' may be broader." (Mot. to Amend at 13, n. 13.) This Court specifically found "there is no fraud, something like fraud, or any injustice as a result of the facts cited by the Government concerning the operations of Travel America and Revcon Nevada." (Decision at 38.) The Court did not and does not equate "any injustice" with "fraud."

Although the Government submitted post-trial proposed findings of fact, at the Court's request, the Government *failed to specify any injustice in connection with the relationship between Revcon Nevada and Travel America.* A careful review of United States' Proposed Findings of Fact (Doc. # 164) fails to show any injustice if Revcon Nevada and Travel America are not found to be alter egos. Proposed finding no. 122, under the heading of "Motive," refers to Raymond Novelli's testimony that "he established and maintained separate corporations 'to keep the liability in certain areas.' " This proposed finding encompasses all of the corporations, but there is no identification about how the separate corporations worked an injustice.

At the Hearing, the Government asserted that there was no injustice in the fact that the taxes had not been paid. Rather, the Government argued that it had established the injustice element needed for a determination of alter ego because the assets were held by one corporation and the liabilities were in the name of a second corporation, thus precluding creditors from reaching the assets of the first corporation to satisfy their claims. The problem is that the record is totally devoid of any evidence in this regard. The Government has failed to point to, and this Court did not find, any specific references in the testimony of either Raymond or Marlies Novelli that demonstrated any instance of a creditor of Travel America that could not obtain satisfaction of a claim or that was not paid because Revcon Nevada held any particular assets. Indeed, the record is silent about this issue regarding any and all of the Novelli Group entities. There is

no basis to substantiate this argument by the Government.

Most of the Government's proposed findings, although *implying* that the Novelli Group entities did not operate in an above-board way, *do not specifically deal with the relationship between Revcon Nevada and Travel America.* The Government was given the opportunity at trial to present evidence of the required element of injustice and was given a post-trial opportunity to identify injustice for the Court. The Government failed to adequately do so. The Court cannot find what has not been demonstrated.

The Government's third argument appears to be largely based on the alleged inherent unfairness of not finding alter ego between Travel America and Revcon Nevada because allegedly most of the tax liability for Travel America related to Travel America employees who provided services for Revcon Nevada. The record also fails to support this assertion. The Government contends:

> While each individual campground had some local employees earning modest wages, the far larger employment tax liabilities that were assessed in the name of Travel America (and before it in the name of All Seasons Resorts) derived from the higher wages paid to employees at the main headquarters office, the services of which employees were rendered for the benefit of the entire organization and all of the various component campgrounds. It would not be merely unjust, but in fact grossly inequitable, for this Court to hold that the individual campground properties—which were essentially the only valuable assets of the enterprise—were insulated from collection for the employment tax liabilities that were incurred with respect to the headquarters employees whose services benefitted all of the campgrounds, where

the income that was derived from the operations of each campground were [sic] swept together and used to meet *net* payroll.

Mot. to Amend at 14–15.

There is nothing in the deposition testimony of Raymond Novelli concerning the wages or salaries paid to any employees—whether located at the Campground or at the headquarters location. There is nothing in his testimony about the number of employees at any particular location, including headquarters. The only testimony, which was limited, about employees being paid at the resort level came from Marlies Novelli. She testified that each Campground had its own separate payroll account and that "in the old days there was [sic] a lot of employees at the resort level.... [I]n Ponderosa's case, they had as many as twenty-five employees.... In a case like Grass Lake Resort, they probably would have had five employees." Marlies further testified that the "people working at the resort level were very low-salaried employees. I should say hourly employees." (Marlies Depo. at 42.)

Despite this reference to the low wages of the resort level employees, there is nothing in the record about the salaries or wages of any employees at the headquarters level with which to contrast this testimony. In addition, there is nothing in the record about how headquarters employees were paid. There is nothing in the record about allocation of the assessed taxes to any group or type of employees. Accordingly, there is no foundation for the Government's argument about the alleged gross inequity of the Decision.

Indeed, although the Government specifically states that the sweep account was used to make net payroll, there is very little evidence in the record about payroll checks. The Government made the following proposed finding of fact: "The payroll

for the employees of Revcon Nevada was handled from the main office of All Seasons Resorts." (Doc. 164, ¶ 41.) In making this proposed finding, the Government cites to Raymond Novelli's deposition at page 50. The actual record however, is somewhat different from the Government's proposed finding. Mr. Novelli actually testified, as follows:

Q. During the period 1993 through 1997, did Revcon Motorcoach, the Nevada corporation, have employees:

A. Of Nevada?

Q. Yes.

A. Yes, it had—

Q. The company that owned Two Springs?

A. It had—at the resort level, it had employees.

Q. And was the payroll for those employees handled from the main office in southern California? When I say, "the Main Office," I mean the Irvine area?

A. Yes. The employees were paid from the corporate headquarters.

Raymond Depo. at 49–50. Thus, the record reflects only that for a four year period, the headquarters "paid" the payroll of the employees who worked at the Campground.[6] There was no testimony that the monies to pay these employees came from the sweep account without being allocated to Revcon Nevada from a record keeping perspective. There was no testimony as to how, how much, or from what account(s) the corporate headquarters employees were paid.

The Government failed to follow up regarding how corporate employees were paid. The following exchange occurred between Mr. Snoeyenbos and Marlies Novelli:

Q. Now, you mentioned a payroll account earlier. Would that same central payroll account be used to pay the salaries of the headquarters personnel in Irvine?

A. No, sir. That would pay all the resorts and headquarters.

Marlies Depo. at 44. Needless to say, the exchange set forth above is somewhat ambiguous and does not establish the Government's argument—which was never made at or prior to trial—that the basis for alter ego is the tax liability of headquarters (i.e., Travel America) employees because such employees provided services to Revcon Nevada.

In addition, Raymond Novelli's answers concerning the on-site employees do not support the Government's contention.

Q. So Revcon had on-site employees and then Two Springs and on-site employees after it acquired.... Revcon and Two Spring. Generally, did the on-site employees of the 10 to 15 to 30, did those—they were operated each by individual corporate entities. Separate corporate entities, is that correct?

A. Some of them. Most of them were individual corporations.

. . . .

Q. Well, when we talked about this sweep account and co-mingled—I think you used that word—the monies went into the individual corporations' accounts, both Revcon and

6. Mr. Novelli further testified that employees of Revcon Nevada probably did not notice the change in ownership when the Campground was transferred from Revcon Nevada to Debtor because "we might not have changed the checks[,]" indicating that the paychecks for employees at the Campground came from the Two Springs individual account rather than the sweep account. (Raymond Depo. at 77.)

Two Springs and were swept upstream to a Guardian Creditor which served as paymaster. But there was always records maintained, was there not, as to what bills were paid on behalf of which corporation and what monies were received on behalf of what corporation?

A. In the computer. It would be entered, The cash flow coming in and the cash flow going out.

Q. So you always knew what balance was due or a plus or minus balance from the receipts and disbursements from the individual corporations?

A. Correct.

Q. And those accounts, I suspect that record keeping in the sweep account enabled you to determine to the penny how much the individual corporations earned or lost every year. Is that correct?

A. Yes.

Raymond Depo. at 113–115. Thus, the Government's argument of gross inequity *because* all payroll came from the sweep account is not based on the record. The record demonstrates that, despite the use of the sweep account, each corporation's debits and credits were kept separately and accounted for.

In addition, in the Motion to Amend, the Government describes the sweep account as a "creditor avoidance mechanism" (Mot. to Amend at 15), but the record does not support this description.[7] The Government failed to adequately develop the record to show that use of the sweep account and/or setting up separate corporations was a contrivance to avoid creditor liability.

Q. . . . Why did you operate with fifteen different corporations owning 20 different properties?

A. One of the reasons was bankruptcy requirements—and we were in bankruptcy since I got into the campground business. In various bankruptcies—one of the requirements was that the lenders got pretty smart on that and said, "Wait a minute. We don't want our corporation in with a bunch of other ones. We'd like to have them individualized."

Q. So that's why you established and maintained separate corporations?

A. Well, also to keep the liability in certain areas. In other words, we just seem to have better control by separate corporations.

Q. When you formed all these corporations you just told me of, was there any thought or any reason doing it to perpetuate a fraud on your creditors or on your members in forming separate corps?

A. I don't know if fraud. It does protect the company. I don't think that is fraud.

I think these corporations and campgrounds had a right to protect themselves.

Raymond Depo. at 118–19. The Government's failure to fully explore or develop the topic of Raymond Novelli's "motive" in setting up separate corporations results in an inadequate factual record. The record does not support the Government's position that there was an injustice to creditors as a result of the separate corporations allegedly being utilized as a "creditor avoidance mechanism."

As set forth above, in support of its position that the Decision should be altered or amended, the Government makes

---

7. See discussion regarding element of injustice at p. 18, *infra.*

(i) a new legal argument—*i.e.,* that the Court should have applied California law to determine if Revcon Nevada and Travel America were alter egos; and (ii) new factual assertions concerning (a) the amount of employee wages, (b) allocation of employment taxes, and (c) the sweep account and/or separate corporations as a creditor avoidance mechanism. These arguments, which are not in any way based on new information or an intervening change in law, were not made at or prior to trial and cannot serve as a basis for the Motion to Amend. The Court finds no merit in the Government's third argument.

## IV. CONCLUSION

For the reasons set forth above, this Court declines to alter or amend the Decision. An appropriate order will follow.

**IT IS SO ORDERED.**

## ORDER DENYING UNITED STATES' MOTION TO ALTER OR AMEND UNDER BANKRUPTCY RULE 9023

For the reasons set forth in this Court's Memorandum Opinion entered on this date, the Court hereby declines to alter or amend the Decision entered on April 9, 2009.

**IT IS SO ORDERED.**