**UNITED STATES of America, Plaintiff,**

v.

**S. Byrne DOYLE, et al., Defendants.**

**No. 99–321.**

United States District Court, W.D. Pennsylvania.

Aug. 4, 2003.

---

Charles M. Flesch, United States Department of Justice, Washington, DC, for plaintiff.

Mark Clement, Pittsburgh, PA, Sally A. Frick, Pittsburgh, PA, Richard M. Nelson, Spear & Hoffman, Cherry Hill, NJ, for defendants.

## OPINION

COHILL, Senior District Judge.

Currently pending before this Court is the Motion for Summary Judgment filed by the United States of America ("United States" or "Government") as against Defendants S. Byrne Doyle ("Mr.Doyle"), Barbara S. Doyle ("Mrs.Doyle"), Maureen Doyle, Brian Doyle, Kathleen Dorsch, Richard Dorsch and Bank of America. Hereinafter S. Byrne Doyle and Barbara S. Doyle will be referred to as the "Taxpayers." Only the Defendant Taxpayers opposed the United States's Motion for Summary Judgment.[1] In Counts I and II of the Second Amended Complaint, the United States alleges that the Taxpayers are each indebted to the United States in an amount in excess of $383,894.08 as a result of income tax, interest and penalty assessments imposed upon them.[2] In Count III of the Second Amended Com-

---

1. While neither Maureen Doyle, Brian Doyle, Kathleen Dorsch, Richard Dorsch nor Bank of America filed any opposition to the Plaintiff's Motion for Summary Judgment, in reviewing the merits of the pending motion for summary judgment and rendering our decision, the Court has taken into account the rights and interests of these parties.

2. In it Brief in Support of Its Motion for Summary Judgment ("United States' Sup-

porting Brief"), the United States states that the amount of income tax and interest owed for tax years 1980, 1981 and 1982 is now $501,570.85 per individual and attaches in support thereof the Declaration of IRS Revenue Officer Patricia Skorupan, ¶¶ 11–12. United States' Supporting Brief, p. 16. The Taxpayers have not disputed the correctness of said figure.

plaint, the United States alleges certain real property located at 1401 Sixth Street, Castle Shannon, Pennsylvania ("the Castle Shannon Property") was fraudulently conveyed by the Taxpayers to two of their children, and asks the Court to: (1) find that the conveyances were fraudulent and must be set aside; (2) find that federal tax liens are attached to the Castle Shannon Property; (3) order said tax liens be foreclosed on the Castle Shannon Property; (4) order the Castle Shannon Property sold; and (5) pay out the proceeds from the sale in a set order. In Count IV of the Second Amended Complaint, the United States alleges that federal tax liens are attached to certain real property owned by the Taxpayers and located at 501 Glen Shannon Avenue, Pittsburgh, Pennsylvania ("the Glen Shannon Property") and asks the Court to: (1) declare said tax liens to be valid and subsisting; (2) order said tax liens be foreclosed on the Glen Shannon Property; (3) order the Glen Shannon Property sold; and (4) pay out the proceeds from the sale in a set order.

For the reasons set forth below, the United States' Motion for Summary Judgment is granted as to all counts in the Second Amended Complaint as against all of the Defendants.

## I. Standard of Review.

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, fail to demonstrate a genuine issue of material fact and that the moving party is thus entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In other words, summary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party must then go beyond the pleadings and, by affidavits, depositions, answers to interrogatories, and admissions on file, designate facts showing that a genuine issue of material fact remains for trial. *Id.* at 324, 106 S.Ct. 2548. In deciding a motion for summary judgment, the facts must be viewed in a light most favorable to the nonmoving party and all inferences must be drawn in that party's favor. *Gray v. York Newspapers, Inc.*, 957 F.2d 1070,1078 (3d Cir.1992).

## II. Factual Background.

Viewing the facts in a light most favorable to the Taxpayers and other defendants as the non-moving parties, following are the facts of record that are relevant to the pending motion for summary judgment. The Taxpayers reside at 501 Glen Shannon Drive, Pittsburgh, Pennsylvania ("the Glen Shannon Property") and have done so for the past 30 + years. For the tax years 1980, 1981 and 1982, the Taxpayers filed a joint income tax return. On December 23, 1986, the Internal Revenue Service ("the IRS") issued a notice of deficiency to the Taxpayers as to tax years 1980, 1981 and 1982. This notice advised the Taxpayers that they owed additional tax and penalties for the three (3) years in question. The reasons for the additional tax and penalties levied on the Taxpayers was that the IRS had disallowed certain deductions that the Taxpayers had taken on their tax returns for tax years 1980, 1981 and 1982 with respect to a horse racing and breeding venture ("the Horse Venture"). On March 27, 1987, the Taxpayers, along with others involved in the Horse Venture, filed a petition with the

United States Tax Court wherein they challenged the IRS' determination that they owed additional taxes and penalties for tax years 1980, 1981 and 1982; this case was captioned *Brown v. C.I.R.,* 1992 WL 155446 (U.S.Tax Ct. July 7, 1992), *aff'd sub nom., Konenkamp v. C.I.R.,* 14 F.3d 47 (3d Cir.1993) ("the *Brown* case").

Mrs. Doyle perceived the Horse Venture to be a lawful horse racing or breeding business or investment. Mrs. Doyle believed that the Horse Venture was lawfully designed to minimize their taxes. Daniel J. Farley, the Taxpayers' tax consultant, was the source of her belief.

On September 17, 1991, while the Tax Court case was pending, the Taxpayers purchased, at a cost of $34,000, certain real property located at 1401 6th Street, Castle Shannon, Pennsylvania ("the Castle Shannon Property"). The Castle Shannon Property was financed by a $41,000 loan which was obtained by the Taxpayers. The $41,000.00 loan was secured by a mortgage placed upon the Glen Shannon Property. Thereafter, the Taxpayers' oldest daughter, Kathleen Dorsch ("Ms. Dorsch"), and her daughter, resided at the Castle Shannon property and paid rent thereon to the Taxpayers.

On July 7, 1992, the United States Tax Court issued a 117 page Opinion in the *Brown* case. The Tax Court found in favor of the United States, including sustaining the penalties imposed upon the Taxpayers. In the Opinion, the Court stated that the issues for decision were: "(1) [w]hether petitioners are entitled to deductions and losses arising out of their investments in various standardbred horse programs; and (2) whether petitioners are liable for additions to tax noted above and the increased interest rate under section 6621(c) for underpayments of tax attributable to tax-motivated transactions." *Brown,* numbered pages 740 and 741 in Flesch's Declaration. The *Brown* court

also stated that "[t]he principal issue for decision is whether the various transactions are so lacking in economic substance as to be considered economic shams." *Id.* at numbered page 847 in Flesch Declaration (footnote omitted). In answering these questions, the court examined the evidence in great detail and concluded, *inter alia,* that: (1) the Court does not believe petitioners reasonably had the objective to realize economic gain from their standardbred activities; (2) "petitioners engaged in the transactions to obtain tax deductions and thereby reduce the taxes they would otherwise have been required to pay on their substantial income from other sources;" (3) "[i]t is apparent that the programs were ... entered into by petitioners for the tax benefits involved;" (4) "the transactions at issue were obvious tax shelter sham transactions, lacking in economic substance and the only purpose for the transactions was to reduce the petitioners' [including the Taxpayers] income tax liabilities;" and (5) "[a]fter entering into the programs, petitioners' conduct does not support their contention that they engaged in the activities with a profit objective." *Id.* at numbered pages 837, 840, 842, 843 and 853 in Flesch's Declaration.

On December 14, 1992, the Tax Court's Decision in the Taxpayers' case was issued. The Taxpayers were aware of the Tax Court decision after it was issued. In the Decision, the Tax Court concluded that the Taxpayers' income tax liabilities for 1980, 1981 and 1982 totaled $67,641.00 and that the Taxpayers also had to pay penalties that totaled $8,776.65. The Decision did not impose any civil penalties on the Taxpayers for fraud. It was the Taxpayers' understanding that once the Tax Court's Decision was issued, the IRS would make assessments based upon that Decision and the IRS would then take administrative collection action against the Taxpayers. It was also the Taxpayers'

understanding, based upon what they were told by their attorney, that they did not have a legal obligation to pay the subsequently assessed 1980, 1981 and 1982 tax debts while the Tax Court case was pending.

In February 1993, the Taxpayers applied to refinance the mortgage on the Glen Shannon Property. Under the "Declarations" section of the Uniform Residential Loan Application, which was filled out by a representative of the mortgage company and signed by the Taxpayers as part of refinancing their mortgage, the Taxpayers responded "no" to the following statements: (1) "[a]re there any outstanding judgments against you?;" (2) "[a]re you a party to a lawsuit;" and (3) "[a]re you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee?". On the Mortgage Application completed by the Taxpayers, the Taxpayers totaled their assets at $248,986.00 and totaled their liabilities at $60,351.00. The mortgage company never asked the Taxpayers about existing Tax Court cases or pending tax assessments. The Taxpayers' personal property is listed in the Mortgage Application as valued at $100,000.00. The Taxpayers "disavow" this amount because "[w]e did not notice it when we signed that Application, which was prepared by a representative of the mortgage company." Barbara Doyle Declaration, ¶ 44.

In March, 1993, the Taxpayers sold the Castle Shannon Property to two of their children, Maureen and Brian Doyle, for $1 and "natural love and affection." At the time of the sale, Maureen Doyle resided with her parents at the Glen Shannon Property and was a dependent of her parents and Brian Doyle considered the Glen Shannon Property as his principal residence (during this general time period, Brian either was residing with his parents or was at away at school or was staying with friends). At the time of the transfer, Brian knew that his parents were having problems with the IRS and it was his understanding that the transfer was to protect the Castle Shannon Property from the IRS for his sister Kathleen who was residing at the Castle Shannon Property with her daughter. The reason stated by the Taxpayers for why they transferred the property was because "we started realizing our own mortality and believed that both of our [children] would outlive us." Byrne Doyle deposition, p. 76. Neither Brian nor Maureen Doyle ever received any rent money directly from Ms. Dorsch with respect to the Castle Shannon Property. Rather, after the transfer to Maureen and Brian Doyle, Mrs. Doyle collected the rent on the Castle Shannon Property from Ms. Dorsch and used the rent money to pay the property taxes on the Castle Shannon Property for Maureen and Brian Doyle.

The 1980, 1981 and 1982 tax debts were assessed on April 20, 1993. The Taxpayers were shocked at the dollar amount of the assessments. The total amount of the assessments, including penalties and interest, was $289,692.88. The federal tax liens for the income tax liabilities for 1980, 1981 and 1982 arose on April 20, 1993, the date of the assessments.

On August 3, 1993, the United States filed a notice of federal tax lien against the Taxpayers with the Allegheny County, Pennsylvania Prothonotary.

The Taxpayers appealed the decision of the Tax Court to the United States Court of Appeals for the Third Circuit. It was their belief that perhaps the amount due in the April 20, 1993 assessments would be reduced to an amount that they could afford to pay or make arrangements to pay. This appeal was unsuccessful, with the Third Circuit court rendering its decision

affirming the Tax Court's decision in November 1993.

In January, 1994, the IRS levied Mr. Doyle's wages. The Taxpayers paid $4200 per month via the wage levy for one year. Mr. Doyle's wages were the Taxpayers' sole income source. The IRS also levied on the Taxpayers' checking accounts and seized the funds therein. After the checking accounts were levied upon, the Taxpayers stopped using the accounts and instead used cash and money orders to pay their bills.

As part of settlement negotiations with the IRS, in July 1994, the Taxpayers offered the Castle Shannon Property. Also as of July 1994, the IRS knew about the transfer of the Castle Shannon Property to Maureen and Brian Doyle.

In November, 1994, the Taxpayers offered to pay to the IRS $75,000 in order to compromise their liabilities. At that time, the Taxpayers told the IRS that after the wage levy, they had spent the bulk of the $31,500 in mortgage proceeds from the refinancing of the Glen Shannon Property to pay their living expenses.

The Taxpayers filed for Chapter 7 bankruptcy on January 4, 1995. The Bankruptcy Petition listed the assessments for the 1980, 1981 and 1982 taxes as debts. The transfer of the Castle Shannon Property was also listed on the Taxpayers' Bankruptcy Petition, a copy of which was served on the IRS. The Taxpayers received a Bankruptcy Discharge on April 11, 1995. After they received the Bankruptcy Discharge, the Taxpayers "believed that the 1980, 1981 and 1982 taxes were discharged, because they were more than 3 years old, and our bankruptcy was filed more than 240 days after their assessment." Barbara Doyle Declaration, ¶ 49. Further, "as a practical matter, [the Taxpayers] did not fear any IRS levy or other action on the amount of the 1980, 1981 and 1982 tax liabilities that are at issue in this case at any time after December 1993. That was because 240 days had expired after their assessment and we could obtain a discharge by filing for bankruptcy." *Id.*

The Taxpayers believed well before 1993, because of news reports and other generally available information sources they had access to at the time, that the Tax Code had been changed to make their personal residence generally exempt from IRS levy.

From April 20, 1993 to December, 1993, the Taxpayers believed that it would be futile to make a payment on an old tax bill that they knew they could never pay in full, especially when it was their understanding that the bankruptcy law allowed them to receive a discharge in bankruptcy 240 days after the April 20, 1993 assessments.

The Taxpayers also believed that they could have stopped the wage levy via bankruptcy. After the wage levy was in effect for one year, the Taxpayers filed for bankruptcy because they were running out of the mortgage proceeds with which to live on.

Brain Doyle transferred his interest in the Castle Shannon Property to his sister Maureen on April 27, 1997 after being told that there was a transferee tax lien filed against him because of his ownership of the Castle Shannon Property and that if he wanted to qualify for a mortgage he was seeking to obtain, he had to transfer ownership of the Castle Shannon Property. On April 30, 1997, Maureen transferred ownership of the Castle Shannon Property to the Taxpayers; she did not receive any money from the Taxpayers for the conveyance. Shortly thereafter, the Taxpayers conveyed the Castle Shannon Property to the defendant Dorsches for $1.00. The Dorsches are the current owners of the Castle Shannon Property.

The Taxpayers did not know that the IRS was asserting an exception to discharge of the 1980, 1981 and 1982 tax debts until December 1999.

As of June 30, 2000, each taxpayer, S. Bryne Doyle and Barbara Doyle, owed $501,570.85 to the United States, for income taxes and interest for calendar years 1980, 1981 and 1982.

## III. Legal Analysis.

### A. Counts I and II of the Second Amended Complaint.

█ As we explained above, in Counts I and II of the Second Amended Complaint, the United States alleges that the Taxpayers are each indebted to the United States in an amount in excess of $383,894.08 as a result of income tax, interest and penalty assessments imposed upon them. The legal theory upon which the allegation is based is that although the Taxpayers received a Chapter 7 discharge from the U.S. Bankruptcy Court, the bankruptcy discharge did not personally discharge the taxpayers from their liabilities for income tax and interest thereon for the years 1980 through and including 1982 because the Taxpayers willfully attempted to evade or defeat paying these taxes and under 11 U.S.C. § 523(a)(1)(C), such conduct excepts discharge from tax liabilities.

The United States Court of Appeals for the Third Circuit explained in *In re Fegeley*, 118 F.3d 979 (3d Cir.1997), that:

[w]hen a debtor files under Chapter 7 of the Bankruptcy Code, the debtor is generally granted a discharge from all debts arising prior to the filing of the bankruptcy petition. The remedial purpose is "to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life [and] a clear field for future effort, unhampered by the pressure and discouragement of pre [-] existing

debt.' " However, this "fresh start" policy provided by the Bankruptcy Code applies only to the "honest but unfortunate debtor."

The [Bankruptcy] Code excepts certain liabilities from discharge. Section 523(a)(1)(C) provides:

(a) A discharge under 727 ... of this title does not discharge an individual debtor from any debt—

(1) for a tax or customs duty—

(C) with respect to which the debtor made a fraudulent return or *willfully attempted in any manner to evade or defeat such tax.*

11 U.S.C. § 523(a)(1)(C) (1994) (emphasis added). These exceptions to discharge are to be strictly construed in favor of the debtor. Moreover, the burden of proving that the debtor's tax liabilities are nondischargeable under § 523(a)(1)(C) is on the United States. The Government must prove by a preponderance of the evidence that the defendant made fraudulent returns or willfully attempted to evade his taxes.

*Fegeley*, 118 F.3d at 982–983.

In *Fegeley*, as in the case *sub judice*, "[t]he Government does not allege that [the defendant] filed fraudulent returns. The sole issue before us is whether [the defendant] "willfully attempted ... to evade or defeat" his income taxes for the tax years [in question] within the meaning of the second part of 523(a)(1)(C)." *Id.* at 983. In deciding this issue, the *Fegeley* court conducted the following legal analysis:

[o]ur analysis begins with an interpretation of the second prong of § 523(a)(1)(C). We must interpret provisions of "the Bankruptcy Code according to the plain meaning of [the] individual provision as long as the provision's language is unambiguous." "Where statutory language is not expressly de-

fined, that language should be given its common meaning." "The plain language of the second part of 523(a)(1)(C) comprises both a conduct requirement that the debtor sought 'in any manner to evade or defeat' his tax liability and a mental state requirement (that the debtor did so 'willfully')."

Looking first to the conduct requirement, it is evident that " 'Congress did not define or limit the methods by which a willful attempt to defeat and evade might be accomplished and perhaps did not define lest its effort to do so result in some unexpected limitation.' " We must give weight to the fact that the Congress included the phrase "in any manner" in the statute. Nonetheless, we should abide by the limitation set out by the Court of Appeals for the Eleventh Circuit in *In re Haas,* 48 F.3d 1153, 1158 (11th Cir.1995):"[A] debtor's failure to pay his taxes, alone, does not fall within the scope of section 523(a)(1)(C)'s exception to discharge in bankruptcy." Instead, we should look to nonpayment of taxes as "relevant evidence which [we] should consider in the totality of conduct to determine whether or not the debtor willfully attempted to evade or defeat taxes."

Although many of the published decisions excepting taxes from discharge under § 523(a)(1)(C) involve debtors who actually did engage in some type of affirmative conduct calculated to evade or defeat payment of their taxes, we observe that the majority of courts have found that affirmative conduct by a debtor designed to evade or defeat a tax is not required. Rather, § 523(a)(1)(C) encompasses acts of culpable omission as well as acts of commission. . . .

We now turn to the required mental state. . . .

The majority of courts to address this [mental state] issue have not required [a showing of fraud]. In doing so, they

"have interpreted 'willfully' for purposes of § 523(a)(1)(C), to require that the debtor's attempts to avoid his tax liability were 'voluntary, conscious, and intentional.' " Thus, to prevail, the Government need only establish that:

(1) [the] debtor had a duty to file income tax returns;

(2) [the] debtor knew he had such a duty; and

(3) [the] debtor voluntarily and intentionally violated that duty.

*Id.* at 982–984 (internal citations omitted). Moreover, the *In re Fegeley* court concluded that in determining whether or not the debtor willfully attempted to evade or defeat taxes, "we should consider . . . the totality of conduct." *Id.* at 983. Thus, to summarize, "[t]he willfulness exception of § 523(a)(1)(C) consists of a conduct element, an attempt to evade, and a mens rea requirement, i.e., doing so willfully." *United States v. Weiss,* 2000 WL 1708802, *3 (E.D.Pa. Nov.15, 2000), *aff'd,* 276 F.3d 582 (3d Cir.2001), *opinion amended and superceded,* 32 Fed.Appx. 32, 2002 WL 397717 (3d Cir.2002), *citing, In re Fegeley,* 118 F.3d at 983.

Thus, the issue before this Court is whether the Taxpayers "willfully attempted in any manner to evade or defeat" income taxes for the tax years 1980, 1981 and 1982. As a preliminary matter, the Taxpayers argue that 11 U.S.C. § 523(a)(1)(C) is only applicable in cases where the debtors had the financial means to pay off their tax debt and that there is a genuine issue of material fact as to whether they had the financial means to pay the money owed to the United States prior to the Bankruptcy discharge in April 1995. "The duty only arises if the Defendants could pay in full prior to the discharge in April, 1995." Taxpayers' Opposition Brief, p. 16. The first basis for their argument is that in the *In re Fegeley* decision, the

appellate court repeatedly discussed that the debtor had or probably had the money to pay but did not do so, and ultimately stated: "Fegeley had a *duty* under the tax law, knew he had that *duty*, and voluntarily and intentionally violated that *duty*. He also had the financial ability to discharge that *duty*." *Fegeley*, 118 F.3d at 984. In support of their "must be able to pay" position, the Taxpayers also argue that the Internal Revenue Code does not provide for partial payments of subsequent assessments, but rather, requires full payment. Taxpayers' Opposition Brief, p. 15, *citing*, 26 U.S.C. § 6155. "Since the duty with respect to subsequent assessments under Code Section 6155 is to *pay in full,* a debtor who cannot afford to pay such an assessment in full upon notice and demand cannot 'voluntarily and intentionally' violate a duty to pay." *Id.*

■ After careful consideration of this argument by the Taxpayers, the Court finds that we disagree with the Taxpayers' "cannot pay" argument. To the contrary, even where a taxpayer does not have the financial means to pay all of the taxes owed, the taxpayer still can "willfully attempt[ ] in any manner to evade or defeat such tax." In so holding, the Court has examined the Third Circuit court's decision in *In re Fegeley* and finds that the *In re Fegeley* decision neither requires nor supports the position contended by the Taxpayers. In *In re Fegeley*, the financial ability of the debtor to have paid the taxes due was but one factor the court found, while conducting its totality of the evidence analysis of the facts, that supported the court's conclusion that the debtor had sought "in any manner to evade or defeat" his tax liability. *Id.* at 983. *See also Krik v. U.S.,* 1999 WL 1001586, *3 (Bankr. E.D.Pa. Sept. 29, 1999) (in conducting totality of the evidence analysis, court took into account that the debtor did not have the ability to pay the tax in concluding that the element of willfulness necessary to find

nondischargeability under § 523(a)(1)(C) had not been met). *But see In re Frosch,* 261 B.R. 181, 188 (Bankr.W.D.Pa.2001) (discussing generally that *"Fegeley* indicated that Debtor must have a duty, which he knows, to file a tax return, must voluntarily fail to file and must have the financial ability to pay the tax").

### 1. Collateral estoppel argument.

Returning to the question of whether or not the Taxpayers' debts for the tax years 1980, 1981 and 1982 are nondischargeable under § 523(a)(1)(C), the United States first argues that the Taxpayers willfully attempted to defeat their tax liabilities at its inception by their involvement in the Horse Venture. Specifically, the United States contends that "the Tax Court found that the taxpayers engaged in a series of transactions (for years 1980–1982) which had no economic substance and were shams" and "[a]ccordingly, under the doctrine of collateral estoppel, the taxpayers may not litigate that they did not willfully seek to evade their tax liabilities." United States' Supporting Brief, p. 30. In support of its collateral estoppel argument, the United States cites to *In re Krumhorn,* 249 B.R. 295 (Bankr.N.D.Ill.2000), *aff'd,* 2001 WL 1155258 (N.D.Ill.2001) *("Krumhorn I ").*

*Krumhorn I* is a decision which addressed whether a debtor in a bankruptcy case was collaterally estopped from litigating whether he had wilfully attempted to evade the payment of taxes based upon the findings of fact and rulings made by a tax court in an earlier case in which the debtor was a party. Ultimately, the court concluded that "because both parties were fully represented in the tax court cases and the issue of whether the Debtor willfully evaded his tax obligations was actually litigated and essential to the tax court's final judgment that the Debtor's trades

lacked economic substance, the Debtor is barred from relitigating the wilful evasion issue here.[3]" *Id.* at 300. In reaching its decision, the court explained that in the earlier tax court case, the tax court had addressed two issues: " '(1) whether ... [the Debtor and his former wife] properly deducted capital losses from purported commodities transactions on their 1978 joint Federal income tax return, and (2) whether ... [the Debtor and his former wife we]re liable for the addition to tax as determined by' the IRS" and ultimately held, *inter alia*, "that petitioner's straddle transactions lacked economic substance" *Id.* at 298, 299 (citations omitted). *Id.* at 299 (citation omitted). The *Krumhorn I* court further stated:

> [t]he tax court first explained that "[e]conomic shams or transactions lacking economic substance are transactions that have actually taken place, but which have no economic significance beyond expected tax benefits," ... and " 'for transactions to be recognized for tax purposes they must have economic substance.' " The tax court then examined the Debtor's trading activities and found that is [sic] was ... [the Debtor's] intent from the very beginning to systematically close straddle legs that, in every case, resulted in losses in year one and to move the offsetting gains to subsequent years. Stated differently, the realization of losses in year one was "preordained". This scheme was not necessary or helpful in making a profit. Hence, the tax court specifically found that the Debtor had intentionally developed a trading scheme for the sole purpose of avoiding his tax obligations. As such both the conduct and the mental

state requirements [of § 523(a)(1)(C) ] ... have been met.
*Id.* at 299.

In response to the United States's collateral estoppel argument, the Taxpayers contend that their pre-assessment conduct does not collaterally estop them from litigating whether they willfully sought to evade their tax liabilities because the issue of fraud was not litigated in the underlying tax court case concerning the horse venture and cite in support of their position the case of *In re Graham,* 973 F.2d 1089 (3d Cir.1992) and *In re Kramer,* 215 B.R. 87 (S.D.Fl.1997). Taxpayers' Opposition Brief, pp. 12–14.

■ Collateral estoppel principles apply in discharge exception proceedings. *Grogan v. Garner,* 498 U.S. 279, 284 n. 11, 111 S.Ct. 654, 658 n. 11, 112 L.Ed.2d 755 (1991). In *In re Graham,* the Third Circuit court explained that:

> [i]ssue preclusion applies when
> (1) the issue sought to be precluded [is] the same as that involved in the prior action; (2) that issue [was] actually litigated; (3) it [was] determined by a final and valid judgment; and (4) the determination [was] essential to the prior judgment.

*Id.* at 1097.

■ As we explained above, the underlying Tax Court litigation with which the Taxpayers were involved was the *Brown* case. In the *Brown* case, the tax court explained in its Opinion that the issues for decision were: "(1) [w]hether petitioners are entitled to deductions and losses arising out of , their investments in various standardbred horse programs; and (2) whether petitioners are liable for additions

---

**3.** Notably, the debtor appealed the bankruptcy court's decision. In *In re Krumhorn,* 2001 WL 1155258 (N.D.Ill. Sept. 28, 2001) ("*Krumhorn II* "), the district court reviewed the bankruptcy court's finding of collateral estop-

pel under a *de novo* standard of review and affirmed the bankruptcy court's conclusion that collateral estoppel barred the debtor from re-litigating the issue of whether he wilfully evaded his tax obligation.

to tax noted above and the increased interest rate under section 6621(c) for underpayments of tax attributable to tax-motivated transactions." *Brown,* numbered pages 740 and 741 in Flesch's Declaration. The *Brown* court further stated that "[t]he principal issue for decision is whether the various transactions are so lacking in economic substance as to be considered economic shams. A transaction which is devoid of economic substance is not recognized for tax purposes." *Id.* at numbered page 847 in Flesch Declaration, *citing Frank Lyon Co. v. United States,* 435 U.S. 561, 573, 98 S.Ct. 1291, 55 L.Ed.2d 550 (1978). (footnote omitted).

Ultimately, the court concluded that "the transactions lacked economic substance, and, accordingly, the transactions have no effect for tax purposes." *Id.* at numbered page 842 in Flesch's Declaration. In so concluding, the *Brown* court stated, *inter alia,* that: (1) the Court does not believe petitioners reasonably had the objective to realize economic gain from their standardbred activities; (2) "petitioners engaged in the transactions to obtain tax deductions and thereby reduce the taxes they would otherwise have been required to pay on their substantial income from other sources;" (3) "[i]t is apparent that the programs were ... entered into by petitioners for the tax benefits involved;" (4) "the transactions at issue were obvious tax shelter sham transactions, lacking in economic substance and the only purpose for the transactions was to reduce the petitioners' income tax liabilities;" and (5) "[a]fter entering into the programs, petitioners' conduct does not support their contention that they engaged in the activities with a profit objective." *Id.* at numbered pages 837, 840, 842, 843 and 853 in Flesch's Declaration.

■ Applying the doctrine of collateral estoppel to the facts of the case *sub judice,* the Court opines that the issue sought to

be precluded, i.e. whether the Taxpayers wilfully attempted to evade or defeat their tax obligations by participating in the Horse Venture, was the same as that involved in the *Brown* action, this issue was actually litigated in the *Brown* action, the issue was determined by a final and valid judgment and the determination was essential to the prior judgment. In so holding, we emphasize that the *In re Fegeley* court expressly concluded that a taxpayer can violate the provisions of § 523(a)(1)(C) without, as the Taxpayers contend, engaging in fraud; the conduct just must be voluntary, conscious and intentional. *See In re Fegeley,* 118 F.3d at 984. Accordingly, the Taxpayers are collaterally estopped from relitigating the issue of whether the Taxpayers wilfully attempted to evade or defeat their tax obligations by participating in the Horse Venture.

**2. The Taxpayers' conduct post-bankruptcy discharge.**

The United States also argues that even if the Taxpayers are not collaterally estopped from relitigating the issue of whether they willfully attempted to evade their tax obligations based upon their conduct with respect to the Horse Venture, summary judgment still should be granted to it as to Counts I and II of the Second Amended Complaint because the Taxpayers' conduct following the December 1992 Tax Court decision constitutes a willful attempt to evade payment of their income tax liabilities such that their tax debt is nondischargeable under § 523(a)(1)(C). United States' Supporting Brief, pp. 32–34. In particular, the United States argues that the Taxpayers engaged in the following conduct post-December 1992 and that this conduct, either separately or *in toto* evidences the Taxpayers' willful attempt to evade their tax obligations: (1) in February 1993, they refinanced their home mortgage to reduce the available equity that existed that was subject to collection by

the IRS; (2) in March 1993, they fraudulently conveyed the Castle Shannon Property to their children Brian and Maureen Doyle;(3) they did not maintain any bank accounts for 5 years after January 1994 when the IRS levied on their accounts; (4) they paid their bills with money orders and used their daughter to pay bills as well; and (5) they did not make any voluntary payments to the IRS. United States' Reply Brief, p. 20. "All of these acts show willful conduct to evade payment of their income tax liabilities, and any one of these acts was sufficient to trigger Section 523(a)(1)(C)." *Id.*

 Upon applying the § 523(a)(1)(C) analysis set forth above by the *In re Fegeley* court to the facts of our case, the Court finds that even examining only the Taxpayers' conduct post December 1992, the United States has proven by a preponderance of the evidence that the Taxpayers' tax liabilities are non-dischargeable under § 523(a)(1)(c). Specifically, the Court concludes that even viewing the evidence of

record in a light most favorable to the Taxpayers as the nonmoving parties, based upon the Taxpayers' actions of: (1) conveying the Castle Shannon Property in March 1993, where their eldest daughter was then residing, to their two other children, Brian and Maureen Doyle, for $1.00 and "natural love and affection" at a time when the Tax Court had already rendered its Decision finding that the Taxpayers owed the United States money for unpaid taxes and penalties and when Brian Doyle was aware that his parents were having problems with the IRS and opined that the conveyance was to protect the property from the IRS for his sister Kathleen; and (2) discontinuing the use the bank accounts for fear that the IRS would levy any additional funds deposited, and instead paying their bills primarily through money orders, the Taxpayers engaged in "willful conduct to evade payment of their income tax liabilities" such that their tax liabilities for 1980 through 1982 are not dischargeable under § 523(a)(1)(C).[4] "An attempt to

---

4. In so finding, the Court expressly disagrees with the position of the Taxpayers that unless the effect of the transfer of the Castle Shannon Property to the children was to mislead the IRS or the transfer was concealed from the IRS, the transfer cannot constitute conduct that triggers the application of § 523(a)(1)(C). See Taxpayers' Opposition Brief, pp. 20–23. Additionally, for purposes of creating a complete Record, with respect to the Taxpayers' conduct in refinancing their mortgage on the Glen Shannon Property, upon reading Mrs. Doyle's Declaration and viewing the statements made therein concerning this refinancing in a light most favorable to the Taxpayers as the nonmoving parties, the Court concludes that at the time the Taxpayers refinanced the mortgage on their residence, they were of the mind set that the Glen Shannon property was generally exempt from levy by the United States and therefore, they legally could refinance the mortgage. Given such an opinion, there exists a genuine issue of material fact as to whether the Taxpayers were attempting to avoid their tax liability when they refinanced their property on Glen

Shannon property. Further, the Court finds that to the extent the Taxpayers, in making their financial decisions, took into account that 240 days post-tax assessment they could file for bankruptcy and have their tax debt for the years in issue discharged, this mind set is not evidence of attempted tax evasion. *See In re Schlesinger*, 290 B.R. 529, 539 (Bankr. E.D.Pa.2002) (where debtor filed for bankruptcy soon after 240 days passed after being assessed taxes due, court disagreed with government's position that the timing of the petition supporting finding the debtor's tax debts were non-dischargeable under § 523(a)(1)(C), explaining that there is a difference between tax avoidance and tax evasion and that "to the extent that a debtor employs legally permissible methods to avoid payment of taxes, such conduct does not constitute improper tax evasion."). Finally, in rendering our decision with respect to Counts I and II, the Court has not considered either Answer # 5 of Barbara Doyle's Response to United States' First Request for Admissions to Barbara Doyle or Answer # 5 of S. Byrne Doyle's Response to

conceal, transfer, or otherwise assign assets in an effort to put them beyond the reach of the IRS for tax collection purposes is a 'manner' of 'attempt[ing] to evade or defeat such tax,' within the plain meaning of section 523(a)(1)(C)." *In re Eleazar*, 271 B.R. 766, 775 (Bankr.D.N.J. 2001), *appeal dismissed*, 2002 WL 471848 (D.N.J. Feb. 11, 2002) *See also In re Sternberg*, 229 B.R. 238 (S.D.Fl.1999) (court held transfer to family member post decision of tax court but prior to assessment of taxes in order to thwart collection or payment of taxes renders tax debts non-dischargeable under § 523(a)(1)(C)).

The United States is entitled to summary judgment as to Counts I and II of the Second Amended Complaint. Judgment will be entered in favor of the United States and against S. Bryne Doyle and Barbara Doyle in the amount of $ 501,-570.85 which represents the Taxpayers' tax liability for calendar years 1980, 1981 and 1982, plus interest from June 30, 2000, to the date that the judgment is satisfied.

### B. Count III of the Second Amended Complaint-fraudulent conveyance claim as to the Castle Shannon Property.

The Court next addresses the fraudulent conveyance claim asserted by the United States in Count III of the Second Amended Complaint. Notably, although the Taxpayers concede that they are willing to part with the Castle Shannon Property if we find, as we do, that the United States has standing to bring its fraudulent conveyance claim,[5] the Court opines that given that title to the Castle Shannon Property currently lies with the Defendants Richard and Kathleen Dorsch, it is in the best interest of the parties and justice if we conduct a complete analysis of the Government's fraudulent conveyance claim.

### 1. Government's standing to assert fraudulent conveyance claim against Taxpayers.

As indicated above, in opposing the United States' Motion for Summary Judgment on the fraudulent conveyance claim, the Taxpayers only contend that the United States does not have standing to prosecute its liens against the Castle Shannon property and therefore, cannot seek summary judgment on Count III. "Only a Bankruptcy Trustee has standing to recover a transfer of property such as the Castle Shannon property that is described in Count III, unless: (a) the Trustee abandons it; or (b) the Trustee is unable or unwilling to bring the claim, and a court finds that not bringing the claim is an abuse of discretion," neither of which occurred in the Taxpayers' bankruptcy case. Taxpayers' Opposition Brief, p. 28.

The United States responds to the Taxpayers' standing argument by contending that once a bankruptcy proceeding is over and the debtor has received a discharge, the Government has standing to bring a state law claim for fraudulent conveyance. Brief in Support of United States' Motion to Strike Barbara Doyle's Declaration, and in Reply to Taxpayers' Opposition to United States' Motion for Summary Judgment ("United States' Reply Brief"), pp. 20–21; Letter Brief dated June 10, 2003.

In *Hatchett v. United States*, 330 F.3d 875 (6th Cir.2003), the United States Court of Appeals for the Sixth Circuit recently held that "[t]hough the trustee

---

United States' First Request for Admissions to S. Byrne Doyle.

**5.** *See* Memorandum in Opposition to Plaintiff's Motion to Strike Barbara Doyle's Decla-

ration, p. 3 ("[we] do not concede what [our] intent in making the conveyance actually was, [we] just say that [we] are willing to part with the Castle Shannon property if the Plaintiff has standing to bring this action.")

has the exclusive right to bring an action for fraudulent conveyance during the pendency of the bankruptcy proceedings, the Bankruptcy Code does not extinguish the right of the Government to bring a state law action for fraudulent conveyance after the debtor receives a discharge in bankruptcy.... Accordingly, because the bankruptcy proceedings are over, the Government has standing to assert its fraudulent conveyance theory." *Id.* at 886. The Court agrees with the *Hatchett* court's analysis of the standing issue and adopts it as our own. *See also Federal Deposit Insurance Corp. v. Davis,* 733 F.2d 1083, 1085 (4th Cir.1984) (where trustee during bankruptcy proceeding had not attempted to attack a fraudulent conveyance, court held that "[o]nce a bankruptcy case has been closed, creditors having unavoided liens on fraudulently conveyed property can pursue their state law remedies independently of the trustee in bankruptcy and thus, creditor with unavoided lien which was attached to certain property was free to attack a fraudulent conveyance of that property)." Accordingly, in that the Taxpayers' bankruptcy proceeding is concluded, the United States has standing to assert its state law fraudulent conveyance theory against them.

### 2. Substantive Analysis of Government's fraudulent conveyance claim.

In Count III of the United States's Second Amended Complaint, the United States seeks to set aside the Taxpayers' conveyance of the Castle Shannon property to Maureen and Brian Doyle and to order the foreclosure and sale of the Castle Shannon Property to satisfy its tax liens. Specifically, the United States contends that the Taxpayers conveyed the Castle Shannon Property to their children, Maureen and Brian Doyle, with the actual intent to hinder, delay or defraud the United States. "Once the conveyance is set aside, the tax lien attaches." United States' Brief in Support of Its Motion for Summary Judgment ("United States' Supporting Brief"), p. 40 n. 13. In support of its allegations, the United States cites to the admissions of the Taxpayers where in response to the question "[t]he conveyances referred to in paragraphs 28, 31, 32, and 33 of the United States Amended Complaint [these paragraphs refer to the Castle Shannon Property] were made with the actual intent to hinder, delay or defraud the United States of America, a creditor of the taxpayers," the Taxpayers both responded: "[a]lthough these are both conclusions of law, this Defendant does not contest these allegations. The government did not take the action that it was required to take in the bankruptcy and lacks standing now to contest the conveyances. Thus, upon discharge, the bankruptcy trustee and judge in effect determined as a matter of law that we had no fraudulent intent." Answer # 5 of Barbara Doyle's Response to United States' First Request for Admissions to Barbara Doyle; Answer # 5 of S. Byrne Doyle's Response to United States' First Request for Admissions to S. Byrne Doyle.

 The applicable law is as follows. "Upon assessment, a federal tax lien attaches to all property and rights to that property belonging to a taxpayer. *See* 26 U.S.C. §§ 6321 and 6322. Generally, a tax lien does not attach to property that a taxpayer previously transferred and which ostensibly no longer belongs to the taxpayer. *Id.* However, if a taxpayer fraudulently disposes of property prior to the existence of tax liens, the Government may seek relief under the applicable fraudulent conveyance laws of the state in which the property is located." *United States v. La-Bine,* 73 F.Supp.2d 853, 857 (N.D.Ohio 1999) (citations omitted in part).

Here the federal tax liens for the Taxpayers' income tax liabilities for 1980

through 1982 did not arise until April 20, 1993, the date of the assessment, and the Taxpayers had transferred the Castle Shannon Property to Maureen and Brian Doyle on March 3, 1993. Therefore, the United States must rely on the fraudulent conveyance laws of Pennsylvania, the state where the property was located, to set the conveyance aside. Because the transfer of the Castle Shannon Property occurred in March, 1993, the applicable fraudulent conveyance laws are those contained in the Pennsylvania Uniform Fraudulent Conveyance Act ("UFCA").[6]

Section 357 of the UFCA provides that: "[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors, is fraudulent as to both present and future creditors." 39 P.S. § 357. A creditor is defined in § 351 of the UFCA as being a "person having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent." *Id.* at § 351. Section 359(1)(a) of the UFCA further provides:

(1) [w]here a conveyance or obligation is fraudulent as to a creditor, such creditor, when his claim has matured, may, as against any purchaser except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase, or one who has derived title immediately or mediately from such a purchaser:

(a) have the conveyance set aside or obligation annulled to the extent necessary to satisfy his claim.

*Id.* at § 359(1)(a). Section 353 of the UFCA provides, in relevant part, that "fair consideration" for property is given when "in exchange for such property . . ., as a fair equivalent therefor and in good faith, property is conveyed or an antecedent debt is satisfied." 39 P.S. § 353(a).

Obviously a critical factor in the analysis of whether the Castle Shannon Property was fraudulently conveyed by the Taxpayers is that the transfer was an intrafamial transfer. The issue of alleged fraudulent conveyances to family members was addressed in *United States v. Kudasik,* 21 F.Supp.2d 501 (W.D.Pa.1998) (Smith, J.). In *Kudasik,* the United States alleged that a taxpayer had fraudulently conveyed various pieces of property to his sister, including certain parcels of land in Central City, which he conveyed for a $1.00 consideration ("the Central City Properties"). The sister subsequently conveyed these properties to her daughter (the debtor's niece), with no consideration being exchanged. In applying the UFCA to the facts of the case, the *Kudasik* court explained as follows about interfamial transfers when allegations of fraudulent conveyance are raised under the UFCA:

[i]n *Iscovitz v. Filderman,* 334 Pa. 585, 6 A.2d 270, 272 (1939),[7] the Pennsylvania Supreme Court recognized that the determination of whether there was an actual intent to hinder, delay or defraud under the Act must "be proved by facts and circumstances which taken together show the existence of fraud. Although the intent must exist at the time the transfer was made, it may be shown by conduct subsequent to the execution of the conveyance of such a nature as to show fraud in its inception." *Id.* (citations omitted). The court affirmed the

---

**6.** While the UFCA was repealed in 1993, it is applicable to conveyances, such as the Castle Shannon Property transfer, which occurred before February 1, 1994, the effective date of the new Uniform Fraudulent Transfer Act, 12 Pa.C.S.A. § 5101 et seq.

**7.** In *Iscovitz,* the defendant had conveyed realty to a straw man who then conveyed the realty to the defendant and his wife as tenants by the entireties. *Id.* at 586, 6 A.2d 270. A year later, the couple had transferred the realty to their children. *Id.* at 587, 6 A.2d 270.

decree that several conveyances from husband to wife, and then from parents to children, were made with the intention of defrauding the creditor plaintiff. The court reasoned

"[w]here the transaction is between husband and wife actual intent *does appear* where it is shown that there was a deed given for a nominal consideration. This is but a presumption of fact and places on the wife the burden of showing the fairness of the transaction. Since family collusion by a debtor is so easy to execute and so difficult to prove, the evidence to sustain the claim of such cases must be clear and satisfactory."

*Id.* at 507. Ultimately, the *Kudasik* court found that because the transfer of the Central City Properties was an intrafamial transfer between brother and sister and there was no evidence of record which would support a finding of "fairness" with respect to the conveyance such that the "clear and satisfactory" burden was not met, the Central City Properties conveyances had to be set aside pursuant to 39 P.S. § 359(1)(a). *Id.* at 508. The *Kudasik* court further concluded that the subsequent conveyance of the Central City Properties to the daughter did not affect the government's right to have the conveyance set aside because she was not a "purchaser for a fair consideration. . . ." *Id.* (citations omitted).

■ Applying the above-stated law to the facts of this matter and using the *Kudasik* decision as a guide, the Court finds as follows. First, by virtue of the Tax Court's Decision in December 1992,

the United States had a claim against the Taxpayers for unpaid taxes at the time of the conveyance of the Castle Shannon Property in March 1993 and therefore, the United States qualifies under the terms of the UFCA as a "creditor" of the Taxpayers. Second, we find that even viewing the Taxpayers' above-quoted admissions in a light most favorable to them as the non-moving party, there is no other way to interpret the Taxpayers' responses other than as admissions, as opposed to a concession, by the Taxpayers that the transfer of the Castle Shannon property was made with the actual intent to hinder, delay or defraud the United States of America, a creditor of the taxpayers. Third, even without considering these admissions, the Court finds that given the undisputed evidence of record that: (1) the March 1993 conveyance of the Castle Shannon Property, where their eldest daughter was then residing, was to their two other children for $1.00 and "natural love and affection;" (2) the conveyance was at a time when the Tax Court had already rendered its Decision finding that the Taxpayers owed the United States money for unpaid taxes and penalties; and (3) at the time of the conveyance, Brian Doyle was aware that his parents were having problems with the IRS and opined that the conveyance was to protect the property from the IRS for his sister Kathleen, there is no genuine issue of material fact with respect to whether the conveyance to Brian and Maureen Doyle was fair; i.e., the presumption that the intrafamial transfer by the Taxpayers for nominal consideration was made with the intent to defraud the United States is not rebutted.[8] Fourth

---

8. In so holding, the Court acknowledges Byrne Doyle's explanation at his deposition that the Taxpayers transferred the Castle Shannon Property to their children because of their awareness of their mortality and that the two children would outlive them, but we find this explanation "inherently incredible" and

"too incredible to be believed by reasonable minds." *Armbruster v. Unisys Corporation,* 32 F.3d 768, 784 n. 21 (3d Cir.1994); *Losch v. Borough of Parkesburg, Pennsylvania,* 736 F.2d 903, 909 (3d Cir.1984). Therefore, the Court concludes that this explanation does not create a genuine issue of material fact

and finally, under these same undisputed facts of record, the Court finds that there is no evidence in the record to raise a genuine issue of material fact as to whether Brian and Maureen Doyle and the subsequent transferees of the Castle Shannon Property were purchasers "for fair consideration without knowledge of the fraud at the time of the purchase, or one who has derived title immediately or mediately from such a purchaser." *See* 39 P.S. § 359(1). Thus, the Court finds that Taxpayers transferred the Castle Shannon Property to Maureen and Brian Doyle with the actual intent to hinder, delay or defraud the United States of America, a creditor of the taxpayers, thereby violating 39 P.S. § 357, and Maureen and Brian Doyle and all of the other subsequent transferees were not purchasers "for fair consideration without knowledge of the fraud at the time of the purchase, or one who has derived title immediately or mediately from such a purchaser." Accordingly, pursuant to § 359(1)(a) of the UFCA, the conveyance of the Castle Shannon Property by the Taxpayers to Maureen and Brian Doyle and all the subsequent transfers of the Castle Shannon Property are set aside and the federal tax lien attaches to the Castle Shannon Property.

With respect to the Government's request that the Court order the sale of the Castle Shannon Property to satisfy the tax liens, 26 U.S.C. § 7403 is entitled "[a]ction to enforce lien or to subject property to payment of tax," and states, in pertinent part, that:

> [t]he court shall, after the parties have been duly notified of the action, proceed to adjudicate all matters involved therein and finally determine the merits of all claims to and liens upon the property, and, in all cases where a claim or interest of the United States therein is established, may decree a sale of such property, by the proper officer of the court, and a distribution of the proceeds of such sale according to the findings of the court with respect to the interests of the parties and of the United States. If the property is sold to satisfy a first lien held by the United States, the United States shall bid at the sale such sum, not exceeding the amount of such lien with expenses of sale, as the Secretary directs.

*Id.* at § 7403(c). Having found that the tax lien is attached to the Castle Shannon Property and therefore, the United States has an interest in the Property, pursuant to § 7403(c), the Court orders that the Castle Shannon Property be sold to satisfy the tax lien.[9] The Court will hold a hearing on September 10, 2003 at 9:30 a.m. to determine who is to conduct the sale and how the proceeds of the sale are to be distributed.[10]

The Government's motion for summary judgment on Count III of the Second Amended Complaint is granted.

## C. Count IV of Second Amended Complaint.

In Count IV of the Second Amended Complaint, the Government asks to foreclose its federal tax lien against the Glen Shannon Property and to have the Glen Shannon Property sold and the proceeds

sufficient to defeat the Government's motion for summary judgment.

**9.** In so ordering, the Court understands that when deciding whether a forced sale of property under § 7403(c) is warranted, the Court has some discretion under equity principles, *see U.S. v. Rodgers,* 461 U.S. 677, 711, 103

S.Ct. 2132, 2152, 76 L.Ed.2d 236 (1983), but concludes that under the facts of this case, such discretion is not warranted.

**10.** Such a hearing will not be necessary if, consistent with this Opinion, the parties stipulate to who should conduct the sale and how the proceeds therefrom should be distributed.

used to satisfy the tax lien. In response, the Taxpayers agree that the Glen Shannon Property is bound by the filing of the Notice of Federal Tax Lien in 1993 and concede that the Plaintiff has a secured claim in the Glen Shannon Property and that the secured claim survived the bankruptcy, but argue that "[t]he secured claim is limited to the value of the residence that was not encumbered by the mortgage on the date of our Bankruptcy." Taxpayers' Opposition Brief, p. 11, *See also Id.* at p. 24 (stating that the lien can be foreclosed, to the extent of the Taxpayers' equity in the residence when the lien attached in 1993).

█ Contrary to the Taxpayers' position, the Court concludes that the Government's secured claim on the Glen Shannon Property is not limited to the extent of the Taxpayers' equity in the residence when the lien attached. Rather, the tax lien attaches to any appreciated value of the Glen Shannon Property, said value to be determined when the property is sold. To hold otherwise would allow a debtor as opposed to a creditor to get the benefit of any appreciation in value and such a result would be unjust. See *United States v. Avila,* 88 F.3d 229, 234 (3d Cir.1996) (where debtor had sold property subject to a tax lien and property subsequently increased in value, court reversed district court's finding that government's tax lien in realty was limited to debtor's equity when he conveyed the property and instead held that tax lien attached to the appreciated value of debtor's former interest in property).

Because the United States has requested that the Court order the sale of the Glen Shannon Property, the Court turns again 26 U.S.C. § 7403. Pursuant to § 7403(c), the Court orders that the Glen Shannon property be sold.[11] The Court will hold a hearing on September 10, 2003 at 9:30 a.m. to determine who is to conduct the sale and how the proceeds of the sale are to be distributed.[12]

The Government's motion for summary judgment on Count IV of the Second Amended Complaint is granted.

## IV. Conclusion.

For the reasons set forth above, the United States' Motion for Summary Judgment is granted as to all counts in the Second Amended Complaint as against all of the Defendants. An appropriate order will follow.

### ORDER

AND NOW, this 4th day of August, 2003, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the Motion for Summary Judgment filed by Plaintiff United States of America (Doc. # 33) is GRANTED ON ALL COUNTS CONTAINED IN THE SECOND AMENDED COMPLAINT as to all of the Defendants (S. Bryne Doyle, Barbara S. Doyle, Maureen Doyle, Brian Doyle, Kathleen Dorsch, Richard Dorsch and Bank of America).

IT IS FURTHER ORDERED, ADJUDGED, and DECREED that judgment is entered in favor of the United States and against Defendant S. Bryne Doyle in

11. Again, the Court understands that when deciding whether a forced sale of property under § 7403(c) is warranted, the Court has some discretion under equity principles, *see U.S. v. Rodgers,* 461 U.S. 677, 711, 103 S.Ct. 2132, 2152, 76 L.Ed.2d 236 (1983), but concludes that under the facts of this case, such discretion is not warranted.

12. Again, such a hearing will not be necessary if, consistent with this Opinion, the parties will stipulate to who should conduct the sale and how the proceeds therefrom should be distributed.

the amount of $501,570.85 (the tax liabilities for tax years 1980, 1981 and 1982), plus interest from June 30, 2000 to the date that the judgment is satisfied.

IT IS FURTHER ORDERED, ADJUDGED, and DECREED that judgment is entered in favor of the United States and against Defendant Barbara Doyle in the amount of $501,570.85 (the tax liabilities for tax years 1980, 1981 and 1982), plus interest from June 30, 2000 to the date that the judgment is satisfied.

IT IS FURTHER ORDERED, ADJUDGED, and DECREED that the conveyance of the Castle Shannon Property from S. Bryne and Barbara Doyle to Maureen Doyle and Brian Doyle and all subsequent conveyances thereof are set aside as fraudulent under 39 P.S. § 357 and 359(1)(a) and declared null and void.

IT IS FURTHER ORDERED, ADJUDGED, and DECREED that the federal tax liens, arising from the assessments issued by the Internal Revenue Service to S. Bryne Doyle and Barbara Doyle on April 20, 1993, attached to the Castle Shannon Property on April 20, 1994.

IT IS FURTHER ORDERED, ADJUDGED, and DECREED that a hearing shall be held in Courtroom 3 of the United States Post Office and Courthouse, 700 Grant Street, 8th Floor, Pittsburgh, Pennsylvania, 15219 on September 10, 2003 at 9:30 a.m. to determine: (1) what official is to conduct the sales of the Glen Shannon and Castle Shannon Properties and (2) how the proceeds of the sales are to be distributed unless the parties stipulate to the official to conduct the sale and the manner in which the proceeds are to be distributed.